66 N.J. Super. 64 (1961)
168 A.2d 412
ANTHONY WOLCZAK, PLAINTIFF-APPELLANT,
v.
NATIONAL ELECTRIC PRODUCTS CORP., CORPORATION OF THE STATE OF DELAWARE AND/OR HANSONVAN WINKLE MUNNING COMPANY, A CORPORATION, INDIVIDUALLY, SEVERALLY AND/OR JOINTLY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 1961.
Decided March 6, 1961.
*67 Before Judges CONFORD, FREUND and KILKENNY.
Mr. Herbert E. Greenstone argued the cause for plaintiff (Messrs. Greenstone & Greenstone, attorneys; Mr. Jerry M. Finn, on the brief).
Mr. George P. Moser argued the cause for defendant Hanson-Van Winkle Munning Company (Mr. William V. Roveto, of counsel).
*68 Mr. Joseph V. Cullum argued the cause for defendant National Electric Products Corp. (Messrs. Townsend & Doyle (Now Doyle & Glavin), attorneys; Mr. Cullum, of counsel).
The opinion of the court was delivered by FREUND, J.A.D.
Plaintiff Anthony Wolczak appeals from a Law Division judgment dismissing his personal injury complaint at the close of all the evidence. His injuries were sustained on February 26, 1957, while he was in the process of drilling an overhead steel beam at the plant of defendant National Electric Products Corp. (National). His electric drill jammed and kicked on him, causing him to fall 10 or 12 feet into an empty steel tank.
Plaintiff was employed as an ironworker by the Elbert Lively Company, engaged primarily in the construction of industrial monorail systems. Defendant Hanson-Van Winkle Munning Company (Hanson) had, in the autumn of 1956, entered into an agreement with National to manufacture and furnish 15 silver-plating tanks and to supply a monorail system for the latter's Elizabeth plant. Hanson, in turn, contracted to the Lively firm the task of providing all equipment, materials and labor necessary for the erection of the monorail structure.
The steel tanks were delivered to National's factory in the early part of February 1957, and were installed by National's own employees. Each of the metal vats was about 11 1/2 feet wide, 1 1/2 feet long, 3 feet deep, and weighed approximately one ton; they were coated on the inside with a rubberized or plastic material. The tanks were placed in parallel fashion at the approximate center of National's 750-foot-long building.
The Lively Company commenced installation of the overhead system  designed to run laterally above the tanks  on February 21, 1957. Work progressed rapidly on the erection of the columns, the supporting members, and the steel beams that would carry the monorails; an overhead *69 crane belonging to National was borrowed as an aid in the actual installation of the monorails, a bridge, and a one-ton crane placed on the bridge.
By the morning of February 26 Lively's job was almost completed. All that remained was to "plumb" the structure, that is, line it up so that the crane would be certain to run along the rail in an unimpeded fashion.
In addition, it was discovered that lateral bracing of the supporting channels (steel beams running the length of the monorails between the columns) was still necessary, and that the holes for the braces had not all been made. Eight angles (specially shaped pieces of steel) were provided for this bracing job, which involved the drilling of several additional holes in the overhead monorail beam and the bolting of the angles, to "stiffen" the structure. After extended preliminary discussion, to be further mentioned hereinafter, plaintiff and a co-worker, Albert Mell, Jr., climbed a ladder to the top of the superstructure to perform the drilling. While Mell sat on the beam watching him, plaintiff drilled the first hole without incident. Mell then dismounted from the beam and proceeded to move the ladder to the next section and to procure some additional bolts. Plaintiff, standing on the 7 1/2 inch wide rail, began to drill the second hole. The hole had almost been made when the drill jammed, kicked, and threw him off balance; Wolczak fell, in a slightly tilted position, into one of the tanks.
As set forth in the complaint and the pretrial order, plaintiff's action against Hanson was grounded in the latter's status as general contractor, allegedly supervising the installation of the entire silver-plating operation in National's plant. Hanson was charged with negligence in providing improperly fabricated steel so that "it became necessary for the plaintiff to expose himself to unnecessary risks and hazards to drill certain holes in the steel"; in failing to provide proper scaffolding; and in failing to coordinate the work so as to avoid hazardous conditions.
*70 National's asserted liability was predicated upon violation of its duty of reasonable care owed to an invitee performing work upon its premises. It was termed negligent in generally failing to provide plaintiff with a safe place in which to work, in neglecting properly to cover the hazardous steel tanks beneath plaintiff's work area, and in failing to provide proper scaffolding and to coordinate the work being done on its property.
The trial court, in dismissing the complaint as to both defendants, found that neither had any control over the plaintiff in the area in which he was working, namely, the superstructure constructed by himself and his employer, Lively. It held that neither National nor Hanson had breached any duty owed to plaintiff under the instant facts and that "the dangerous condition under which the plaintiff worked was incidental to and arose from the work itself."

I.

AS TO HANSON.
The liability of a general contractor to employees of subcontractors performing construction or other work on the premises is founded in part on the assumption that the owner has placed the general contractor in physical control of the job site; by virtue of this control, the general contractor is burdened with a duty similar to that owed by the landowner to business invitees, to exercise reasonable care to maintain the premises in a reasonably safe condition. Butler v. King, 99 N.H. 150, 106 A.2d 385 (Sup. Ct. 1954); Revels v. Southern California Edison Co., 113 Cal. App.2d 673, 248 P.2d 986, 989 (D. Ct. App. 1952); Fisher Construction Company v. Riggs, 320 S.W.2d 200, 206 (Tex. Civ. App. 1959); cf. Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853, 868 (Sup. Ct. 1950); Restatement, Torts, § 387. In addition, his supervision of or active participation in the manner of work of the subcontractor may result in the imposition of a broader *71 duty of care, premised essentially on the emergence of a sufficient degree of detailed superintendence over the latter's employees as to invoke a legal relationship analogous to that of master-servant. Anderson v. Foley Bros., 110 Minn. 151, 124 N.W. 987 (Sup. Ct. 1910); Kuptz v. Ralph Sollitt & Sons Const. Co., 88 F.2d 532, 534 (5 Cir. 1937); Restatement, Agency 2d, §§ 220, 516; 57 C.J.S. Master and Servant § 602, p. 374. See Bergquist v. Penterman, 46 N.J. Super. 74, 85 (App. Div.), certification denied 25 N.J. 55 (1957).
Absent control over the job location or direction of the manner in which the delegated tasks are carried out, the general contractor is not liable for injuries to employees of the subcontractor resulting from either the condition of the premises or the manner in which the work is performed. See Annotation, 20 A.L.R.2d 868, at pp. 901-04. Nor is his immunity disturbed by the exercise of merely such general superintendence as is necessary to insure that the subcontractor performs his agreement. Cf. Giroud v. Stryker Transportation Co., 104 N.J.L. 424, 426 (E. & A. 1928); Majestic Realty Associates, Inc. v. Toti Contracting Co., 54 N.J. Super. 419, 426 (App. Div.), affirmed 30 N.J. 425 (1959). Of course, specific instances of direct interference which proximately cause injury to the employees of the subcontractor  such as the furnishing of defective materials (Annotation, supra, 20 A.L.R., at pp. 906-07) or the giving of a single authorized direction thwarting the subcontractor's effort to provide safeguards, Trecartin v. Mahony-Troast Construction Co., 18 N.J. Super. 380, 389 (App. Div. 1952), affirmed 21 N.J. 1 (1956)  will heap liability upon the shoulders of the general contractor.
Applying these principles to the situation at hand, we are of the firm opinion that Hanson owed no duty towards plaintiff under the circumstances mentioned. Hanson did not  in actuality or by contractual privilege  supervise, direct, or concern itself in any way with the installation of either the tanks or the monorail system. It merely manufactured *72 the tanks and forwarded them to National in conformance with the latter's order. As for the monorail system, complete responsibility for supplying the materials and installing the superstructure was delegated to Lively, the East Coast representative of the American Monorail Company. Hanson neither undertook to coordinate the erection of the system nor furnished plaintiff's employer with equipment for the operation; as far as the record indicates, no representative of Hanson was present at the National plant during the installation of the monorail system. Although reference is made in the testimony to a stipulation, in Hanson's purchase order placed with Lively, to the effect that "* * * the purchaser will move any obstruction that may interfere with the installation * * *," there is no evidence of any request by Lively to have the metal tanks moved as a precondition to performance of its job.
In short, Hanson, as general contractor, never assumed supervision over the working premises; it delegated both in form and in substance the direction and control of the details of the work and manner of its performance to Lively, a reputable independent contractor; it neither supplied nor agreed to supply any materials to the latter, and did not issue any directives to the Lively personnel during the course of their activities. It is not necessary to consider whether delegation of direction and control would relieve it of liability  with respect to a claim by an employee of the delegatee rather than a third person unrelated to the work  if the activity were inherently dangerous. There is no peculiarly high risk of harm to the public or to adjoining landowners in the performance of drilling on a scaffold or superstructure. Cf. Hard v. Hollywood Turf Club, 112 Cal. App.2d 263, 246 P.2d 716, 724 (D. Ct. App. 1952). See Majestic Realty Associates, Inc. v. Toti Contracting Co., 30 N.J. 425, 436 (1950); Restatement, Torts, § 416. We raise the question only to indicate a considerable disparity of views as to whether the principle of non-delegability for inherently dangerous activities inures to the benefit of employees *73 of the independent contractor. See Salmon v. Kansas City, 241 Mo. 14, 145 S.W. 16, 39 L.R.A., N.S., 328 (Sup. Ct. 1912); Annotations, 23 A.L.R. 1084, 1133-35 (1923); 20 A.L.R.2d, supra, at pp. 904-06. As bearing upon the point of view held in this jurisdiction, see Gibilterra v. Rosemawr Homes, 19 N.J. 166, 171 (1955).

II.

AS TO NATIONAL.
Plaintiff's major contention is that National, by virtue of its prior installation of the metal tanks beneath the Lively job site, violated its duty to provide him with a safe place in which to work. It is also claimed that National actively interfered with Lively's proposed erection of a scaffold over the tanks for the purpose of simplifying Wolczak's final drilling assignment.
An owner of property who engages an independent contractor to work upon his premises extends to the employees of the latter, while at the job location executing the work, an implied assurance that ordinary care has been exercised to render that location reasonably safe for the invitees' purposes. Murphy v. Core Joint Concrete Pipe Co., 110 N.J.L. 83, 86 (E. & A. 1933); Gudnestad v. Seaboard Coal Dock Co., 15 N.J. 210, 219 (1954); Farrell v. Diamond Alkali Co., 16 N.J. Super. 163, 167 (App. Div. 1951). Of course, along the lines of the principles stated in Part I, supra, the active interference of the owner in the manner of doing the work may implicate him in negligence for injuries to the employees of the subcontractor related to the manner in which the work is performed or to the furnishing of defective equipment. Riley v. Jersey Leather Co., 100 N.J.L. 300, 302 (E. & A. 1924); cf. Meny v. Carlson, 6 N.J. 82, 98 (1950); see Hardy v. Delaware, L. & W.R.R. Co., 57 N.J.L. 505, 507 (Sup. Ct. 1895); Cuff, Adm'x v. Newark & New York R.R. Co., 35 N.J.L. 17 *74 (Sup. Ct. 1870), affirmed 35 N.J.L. 574 (E. & A. 1871); see generally, Annotation, 44 A.L.R. 932 (1926).
Turning first to the question of active interference, plaintiff's charge in this respect is bottomed entirely on the testimony of Lively's crane run foreman, Edward J. Dunn, that National's plant maintenance superintendent refused, upon his request, to allow the erection of a scaffold upon the metal tanks in order to ease Wolczak's task in attaching the angle irons. The National superintendent, Herbert W. Wrozina, denied that such an exchange ever occurred. Even on Dunn's testimony, all that was prohibited was the physical placement of scaffolding material on the tanks. As indicated above, there was evidence that the tanks had a thin rubberized or plastic protective coating which inferably might have been impaired by placing scaffolding in contact with them. While a jury question would, at this posture of the proofs, certainly be raised, the testimony of Norman Harvey, Lively's superintendent in charge of the entire job and Dunn's superior, is conclusive of the issue. Harvey related that he had made a purposeful decision not to erect scaffolding or position planks merely in order that Wolczak might drill several holes. He noted that the placement of planks between the channel and monorail would have been on a slant  not, in his estimation, a "good condition." In regard to scaffolding, he said:
"* * * You can erect a scaffold almost anywhere, but in some instances the advantages are outweighed by the disadvantages. In this particular instance it is my feeling that we would have been involved in more of a job erecting the scaffold than the job, itself, and that the contingent dangers of erecting the job would be just as applicable to the erecting of the scaffold."
In view of our determination, as a matter of law, that the failure to use scaffolding was primarily the result of a deliberate on-the-spot decision by plaintiff's superior, it becomes unnecessary to resolve the issue of whether the alleged statements of Wrozina were binding on his employer, National.
*75 The duty to provide a reasonably safe place in which to work is relative to the nature of the invited endeavor and does not entail the elimination of potential operational hazards which are obvious and visible to the invitee upon ordinary observation. Horton v. Smith, 128 N.J.L. 488 (Sup. Ct. 1942); Mergel v. Colgate-Palmolive-Peet Co., 41 N.J. Super. 372, 378-79 (App. Div.), certification denied 22 N.J. 453 (1956). This is especially so when the invitee is an experienced laborer hired either to correct the very danger present or to perform his tasks amidst the visible hazards. The landowner may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly. Thus the unimpaired line of holdings to the effect that the duty to provide a reasonably safe working place for employees of an independent contractor does not relate to known hazards which are part of or incidental to the very work the contractor was hired to perform. McDonald v. Standard Oil Co., 69 N.J.L. 445, 448 (E. & A. 1903); Broecker v. Armstrong Cork Co., 128 N.J.L. 3 (E. & A. 1941); Beck v. Monmouth Lumber Co., 137 N.J.L. 268 (E. & A. 1947); Gibilterra v. Rosemawr Homes, supra, 19 N.J., at page 170; Huels v. General Electric Co., 134 N.J.L. 165 (Sup. Ct. 1946); Canonico v. Celanese Corp. of America, 11 N.J. Super. 445, 454 (App. Div. 1951); Trecartin v. Mahony-Troast Construction Co., supra, 18 N.J. Super., at p. 386; Mergel v. Colgate-Palmolive-Peet Co., supra, 41 N.J. Super., at p. 379; Jensen v. Somerset Hospital, 58 N.J. Super. 204, 208 (App. Div. 1959), certification denied 31 N.J. 551 (1960). See 3 Stevenson, Law of Negligence (1954), §§ 863, 865, pp. 1316-17, 1318-20.
It is significant to note that each of the aforementioned decisions is explainable in terms of the equation, in Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 48-50 (1959), of assumption of risk in its primary sense and lack of duty or failure to breach the duty owed. These doctrines, traceable *76 to the law of master-servant, constitute a shorthand description of that species of occupational risk which, because of its obvious nature, its intimate relation to the task being performed, and the presumed expertise of the person encountering it, was formerly non-remediable if injury resulted and is now compensable solely through the medium of workmen's compensation laws. See 2 Harper & James, Torts, § 21.4, pp. 1175-79 (1956). The extension of this concept to the realm of the employer-independent contractor tort relationship is amply warranted by the obvious reliance of the employer on the skills of one hired to perform a task generally unrelated to the employer's own work.
Wolczak was a man of some 15 years' experience as an ironworker. His foreman, Dunn, described him as a "good ironworker" and testified that the maneuver attempted by him  "without scaffolding or planks or anything else"  was a not infrequent one in the ironworker's repertoire. The testimony indicates that plaintiff and his co-worker, Mell, were given the opportunity to use planks as a support in their drilling operations, but declined. Wolczak testified that he performed the job as he did "because there was no other way that I, in my judgment, thought was possible * * *." We are compelled to conclude that the risk entailed by him in climbing onto the almost completed superstructure, above the installed tanks which were an integral part of the silver-plating system, in standing on a steel beam 7 1/2 inches wide and there operating a powerful 20 to 25-pound drill, falls squarely within the category of hazards not attributable to any breach of duty on the part of the landowner.
In view of our determination that National breached no duty to Wolczak by the mere prior placement of tanks at the working location or in failing to control the use of scaffolding, it becomes unnecessary to discuss the additional questions of proximate cause and contributory negligence.
The trial court's rejection of plaintiff's proffer of expert witness testimony with respect to safety standards *77 and customs in the ironworking industry does not constitute error. The evidence offered would have had no bearing on the liability of Hanson or National. In the absence of interference by either of the defendants in the performance of the independent contractor's work, the duty to insure that the job was performed in a safe manner was solely that of plaintiff's employer, Lively, and its supervisory personnel. Possible negligence on the part of the latter is not material to the issues before us.
The judgment of the trial court is in all respects affirmed.