209 N.J. Super. 60 (1986)
506 A.2d 1258
LOUIS SANNA AND JOSEPHINE SANNA, HIS WIFE, PLAINTIFFS-APPELLANTS,
v.
NATIONAL SPONGE COMPANY AND XYZ COMPANY (A FICTITIOUS NAME) DEFENDANTS-RESPONDENTS AND NATIONAL SPONGE COMPANY, DEFENDANT-THIRD PARTY PLAINTIFF
v.
JOHN S. SINCAK & COMPANY, THIRD PARTY DEFENDANT.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1985.
Decided March 12, 1986.
*61 Before Judges KING, SIMPSON and SCALERA.
*62 Gerald R. Stockman argued the cause for appellants (Stockman, O'Donnell & Sypek, attorneys; Maria Marinari Sypek, on the brief).
Charles A. Delehey argued the cause for respondent National Sponge Company (Lenox, Giordano, Devlin, Delehey & Socey, attorneys; Paul N. Daly and Charles A. Delehey, on the brief).
The opinion of the court was delivered by KING, P.J.A.D.
In this case the defendant, a sponge-rubber carpet cushion manufacturer, hired plaintiff's employer, John Sincak & Company (JSC), an independent contractor, to insulate a room in its factory in Trenton. While doing this work, plaintiff was injured when a makeshift scaffold collapsed. At the end of the plaintiff's case, the judge granted a judgment of involuntary dismissal. R. 4:37-2(b). We conclude that plaintiff presented a case for the jury and reverse.
For about five years before this accident on January 8, 1981, defendant had employed JSC as an outside, independent contractor to remodel its factory. During those years, plaintiff occasionally worked for JSC at defendant's factory running jackhammers, pouring, pushing and raking concrete, and assisting tradesmen such as carpenters and masons as general laborers. When JSC would work at defendant's factory, defendant would lend JSC the necessary equipment, if it was available.
Several days before this accident a sprinkler system in the factory had frozen because of poor insulation, flooding the maintenance department and environs. This emergency problem needed prompt correction. Thus, defendant and JSC entered into an oral contract to install new insulation.
Early in the morning of January 8 plaintiff was told by his boss to report to the coloring room at defendant's factory. When plaintiff arrived at 8 a.m. he met a co-worker who was already installing insulation on the walls of the coloring room. *63 Plaintiff set to work and by 10 a.m. they started to insulate the ceiling of the coloring room. An elevated area in the coloring room described as a "flat deck" enabled plaintiff and his co-worker to reach the ceiling. But at about noon, plaintiff and his co-worker reached a part of the ceiling not accessible from this elevated area.
To continue their ability to reach the ceiling, plaintiff and his co-worker arranged a scaffold. This scaffold was constructed from an aluminum ladder (dismantled in two parts), supplied by JSC, and a forklift and some planks supplied by defendant. Plaintiff described the scaffold arrangements as follows.
Well, we placed [the forklift] in the middle of the room ... to catch the tank and two ladders we put one ladder over one side of the wall, and we put a plank from that tank to the ladder, and then we used another ladder with a plank and another section with another plank so we had a good solid platform to work with, with the forklift in the middle.
This arrangement "worked out real fine." After plaintiff worked with this scaffold arrangement for about an hour, an employee of defendant removed the borrowed forklift because he needed it immediately for another task. Plaintiff then told an employee of defendant that he needed another ladder to finish the job. Defendant's employee loaned plaintiff a wooden ladder which plaintiff used in place of the forklift in the scaffold arrangement. This ladder-scaffold arrangement was "shaky" and not as secure as the forklift setup.
About an hour after plaintiff began working upon the new scaffolding arrangement, it collapsed causing him to fall and severely injure his left arm. He said that "all of a sudden it came down and hit the floor and I just laid there and moaned." Plaintiff did not know the precise cause of the accident. He surmised that grease on the aluminum ladder owned by JSC could have caused it to give way from the wall. There was also some evidence that the aluminum ladder supplied by JSC may have had a broken foot after the accident. Apparently, there was nothing structurally wrong with the defendant's wooden ladder after the accident.
*64 Plaintiff also said that the elevated area or "flat deck" upon which they had been working before was greasy. While he and his co-worker were working on this deck, they tracked grease from it onto the concrete floor upon which the jerry-built scaffold was erected.
Glen Hartman, plaintiff's co-worker, testified in the presentation of the plaintiff's case. He said that for one or two days before the accident he had been installing insulation in the coloring room where plaintiff fell. He said that the floor of the room at this time was slippery in some spots and had a slime on it.
George Lane, the defendant's employee relations manager, also testified in the plaintiff's case. The defendant was completely familiar with JSC's ongoing practice of borrowing equipment and tools to perform any given job on defendant's premises. There was no conventional scaffolding available on the premises that JSC could borrow. Lane testified to an investigative report that he prepared following the incident. The report was the subject of this testimony.
Q [By Plaintiff's Attorney]: No, I interrupted you, but I just wanted to make sure that these were your observations. If you'd continue on, you say I observed 
A: "I observed the following unsafe conditions: One, the contractor had used two ladders to make a scaffolding from. Two, one of the ladders had been place against a wall with a board running from the soda bicarbonate tank to the ladder with no substantial means of holding the board. See pictures taken immediately after the incident."
Q: Now, those are the pictures were have?
A: That's correct.
Q. All right. Go ahead.
A: "Three, the safety feet on the ladders were missing. On checking with maintenance, the ladders did not belong to National Sponge Cushion."
Q: So neither  your report indicates that neither of the ladders involved in this accident belonged to National Sponge, is that correct?
A: That's correct.
Q: Go ahead.
A: "Four, the way the contractors were working at installation of insulation did not meet standard, this was not approved by N.S.C. personnel. Scaffolding should have been installed properly to install this insulation."

*65 Q: You indicated that in your opinion, there should have been a scaffold, should have been scaffolding there, right?
A: That's correct.
Q: Was there any scaffolding in the area?
A: When I say scaffolding, I'm thinking of a, of a system whereby there is a metal, metal post, and then they put a board across it and they build this thing up as high as they want to go.
Q: Mr. Lane, I asked you was there any scaffolding in the area at all, and I again 
A: If you're asking 
Q:  appreciate your volunteering for us what you mean by scaffolding, but let me ask you, was there any scaffolding in the area of this accident when you investigated?
A: What do you consider scaffolding, are you talking about a board?
Q: What did you consider scaffolding in the report?
A: I considered scaffolding, as I said before, a system of being able to move up, which you've seen in many contractors' areas, to be able to work in the ceiling area. If you're talking about a board, there was boards there, yes.
Q: All right. But you mean these  and you're right, we've all seen them from time to time, scaffolding where there will be pieces of metal with boards on top, and the metal is such that you can put, you can slide one piece into another and 
A: That's right.
Q:  and raise and lower it, correct?
A: That's correct.
Q: Metal scaffolding?
A: That's correct.
Q: Typically often used by contractors on all variety of jobs, is that correct?
A: That's correct.
Q: Was there any scaffolding of that sort any where in the area?
A: No.
Q: And neither Sincak had any of it in the area, nor National Sponge, correct?
A: We don't own any, no.
Q: Okay. You don't own any, neither Sincak nor National Sponge had any there, is that correct?
A: No.
Q: All right. Now, I interrupted you, you hadn't completed. What other observations did you make?
A: "Five, Mr. Sanna states that he put a board from the soda bicarbonate tank to the ladder, that as he neared the end of the board near the ladder, that the ladder had slipped and he fell."
Q: All right. And these, this report you submitted to your employer, is that correct?
A: That's correct.
*66 Lane admitted that the job was an emergency and that usual procedures were side-stepped.
We conclude that plaintiff produced sufficient evidence of defendant's control over and participation at the plaintiff's workplace being used at the time of the accident to create a jury question on whether defendant breached its nondelegable duty to provide a reasonably safe place to work. This control included first providing and then removing the forklift from the jerry-rigged scaffolding, not providing conventional scaffolding in the first place once it voluntarily had participated in the undertaking to help furnish scaffolding materials, and its general maintenance of the work area in the aspect of cleanliness. The trier-of-fact could reasonable have concluded that some or all of these factors probably did contribute substantially to the accident. Of course, any of plaintiff's own negligence as a substantial factor would also be a jury question, as would any negligence of plaintiff's employer on the issue of proximate cause. See Brown v. United States Co., 98 N.J. 155, 171-173, (1984).
The owner of land who invites workmen of an independent contractor to come upon his premises is under a duty to exercise ordinary care to render reasonably safe the areas in which he might reasonably expect them to be working. Hardman v. Ford Motor Co., 70 N.J. Super. 275, 285-286 (App.Div. 1961), certif. den. 36 N.J. 299 (1962); Zentz v. Toop, 92 N.J. Super. 105, 111 (App.Div.), aff'd 50 N.J. 250 (1966); Piro v. Public Service Electric & Gas Co., 103 N.J. Super. 456, 463 (App.Div.), aff'd 53 N.J. 7 (1968). The landowner's duty includes the obligation of making a reasonable inspection to discover defective and hazardous conditions, Zentz, 92 N.J. Super. at 111. The obligation upon the landowner of either making the condition of his premises reasonably safe or giving adequate warning imposes upon him the duty to furnish such safeguards as may reasonably be necessary. See Zentz, 92 N.J. Super. at 113. Moreover, the duty of a landowner to such an invitee is nondelegable. *67 The landowner cannot escape its responsibility to provide a safe place to work by attempting to transfer it to another. The possibility that another person may also have been negligent does not relieve the landowner of his legal duty. Piro, 103 N.J. Super. at 463.
There are, however, New Jersey cases which qualify the landowner's duty to workmen of an independent contractor on his premises. The duty to provide a reasonably safe place to work is relative to the nature of the invited endeavor and does not entail the elimination of operational hazards which are obvious and visible to the invitee upon ordinary observation and which are part of or incidental to the very work the contractor was hired to perform. Wolczak v. National Electric Products Corp, 66 N.J. Super. 64, 75 (App.Div. 1961). The landowner is under no duty to protect an employee of an independent contractor from the very hazard created by doing the contract work. Gibilterra v. Rosemawr Homes, 19 N.J. 166, 170 (1955); Wolczak, 66 N.J. Super. at 75. In Wolczak, this court went as far as stating that the landowner may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly. 66 N.J. Super. at 75.
In determining whether the landowner was implicated in negligence, both the Wolczak and Gibilterra decisions stressed the degree to which the landowner participated in, actively interfered with, or exercised control over the manner and method of the work being performed at the time of the injury. See Gibilterra, 19 N.J. at 171, Wolczak, 66 N.J. Super. at 73.
The standard this court must apply in reviewing the propriety of the involuntary dismissal of plaintiff's case is whether the evidence, together with legitimate inferences which can be drawn therefrom, sustain a judgment in plaintiff's favor. R. 4:37-2(b). This entails accepting as true all evidence supporting plaintiff's case and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom to *68 the effect that if reasonable minds could differ the motion must be denied. Dolson v. Anastasia, 55 N.J. 2, 5 (1969).
The evidence indicating that there was grease and slime on the surfaces upon which plaintiff constructed the scaffold could have led the jury to infer that defendant negligently maintained its premises and did not provide a reasonably safe place in which plaintiff could work. Although plaintiff may have tracked the grease about the surfaces, that evidence would have been considered by the jury in determining the extent of plaintiff's own negligence, if any. Additionally, it is uncontradicted that the deck upon which plaintiff worked before erecting the scaffold was full of grease. Finally, Hartman, plaintiff's co-worker, testified that a day before the accident, he found the floor slippery and greasy. Although plaintiff himself did not know what caused the scaffolding to collapse, a legitimate inference could have been drawn from the evidence that the grease on the floor upon which the scaffolding rested was a factor.
Even stronger evidence was presented to show that the defendant assumed the duty of furnishing or assisting in furnishing a secure scaffold. If defendant had done nothing and plaintiff's employer JSC had assumed sole control over the ladders and scaffolding used to gain access to the work area, plaintiff would have no case against defendant on this theory. But the evidence indicated that employees of the defendant knew plaintiff and his co-worker had created a makeshift scaffolding, partly from defendant's materials, in order to perform the job. This was established by testimony showing that the defendant had supplied plaintiff with a forklift and planks and later removed the forklift and gave him a wooden ladder in its place. Once defendant undertook to supply parts of the scaffolding, especially in view of the past relations of defendant and JSC where defendant frequently provided equipment to its contractor, and the emergency nature of the work, a jury could find that defendant exercised the requisite control over the jobsite to create a liability exposure. See Hardman v. Ford *69 Motor Co., 70 N.J. Super. at 291-292. Defendant argues, citing Wolczak, that it did not have a duty to protect plaintiff from hazards incidental to the nature of the work. However, the applicability of Wolczak here is questionable in light of defendant's direct participation in furnishing and removing scaffolding material. Moreover, plaintiff's injury did not stem from a dangerous condition he was called on to correct and was not one which inhered in the work he was doing. Falling from substandard scaffolding was not an inherent hazard involved in installing insulation; a jury could find that the danger was created by the conjunction of the faulty scaffolding and the worksite environment.
In conclusion, and because the case must be retried, we observe that federal Occupational Safety and Health Administration Standards may have been relevant and perhaps violated in this situation. These standards, contained in 29 C.F.R. § 1926, have been adopted in this state. See N.J.A.C. 12:100-5.2(a). There are very specific standards for "Ladders and Scaffolding," see 29 C.F.R. § 1926.450, 451. Even if not specifically applicable in the regulatory context of this accident,[1] a question which is not before us and which we do not decide today, the standards expressed in the OSHA regulations may be recognized and accepted as objective safety standards and practices generally prevailing in the community if appropriate expert or other testimony so develops. McComish v. DeSoi, 42 N.J. 274, 282 (1964); see Cepeda v. Cumberland Engineering Company, 76 N.J. 152, 193 (1978); Black v. Public Service Elec. & Gas Co., 56 N.J. 63, 77 (1970); Coleman v. Steinberg, 54 N.J. 58, 65 (1969).
Reversed and remanded for a new trial.
NOTES
[1] See Historical Note to Chapter 100 of Title 12, N.J.A.C. and "Scope"  N.J.A.C. 12:100-1.4. See also Historical Note to Chapter 180 of Title 12, N.J.A.C.