770 A.2d 1173 (1999)
Lisa PFENNINGER, Executrix of the Estate of Matthew Pfenninger, Deceased, Plaintiff-Appellant,
v.
HUNTERDON CENTRAL REGIONAL HIGH SCHOOL, Hunterdon Central Regional High School District Board of Education, Hunterdon County, A.J. O'Sullivan Architects, P.A., Andrew J. O'Sullivan, C.J. O'Sullivan, a/k/a C.J. Ostergaard, John Stana, Barry Imbowdin, and Kenneth R. Quabeck, Defendants-Respondents, and
Joseph Krehely, Hunterdon County Soil Conservation, Raritan Township, State of New Jersey, Fred Cappola, Mark Symancek, and Aaron Plumbing, Defendants.
Superior Court of New Jersey, Appellate Division.
Submitted September 13, 1999.
Decided October 1, 1999.
*1175 Victor A. Rotolo, Lebanon, attorney for appellant (Mr. Rotolo, of counsel and on the brief; Michael F. Midlige and Matthew F. Richter, on the brief).
Marshall, Dennehey, Warner, Coleman & Goggin, Wilmington, DE, attorneys for respondents A.J. O'Sullivan Architects, P.A., Andrew J. O'Sullivan, C.J. O'Sullivan, and Kenneth R. Quabeck (John H. Osorio and John H. King, of counsel; Mr. King, on the brief).
Romando, Astorino, McLarty & DeMille, Hamilton, NJ, attorneys for respondents Hunterdon Central Regional High School, Hunterdon Central Regional High School Board of Education, Hunterdon County, John Stana, and Barry Imbowdin (Robert A. McLarty, Jr., of counsel and on the brief).
Before Judges CONLEY, BRAITHWAITE and COBURN.
*1174 The opinion of the court was delivered by CONLEY, J.A.D.
While in the process of laying drainage piping in an unbraced nine-foot excavated trench, Matthew Pfenninger, the owner and principal officer of Countywide Excavating Company, was crushed to death when the trench caved in. In the ensuing wrongful death action, Matthew's wife, the plaintiff herein, sued, among others, the Hunterdon Central Regional High School District Board of Education (Board), as owner of the site of the accident, and its architect, A.J. O'Sullivan Architects (O'Sullivan). Finding the Board's role in the project to have been no more than a mere landowner, see e.g., Wolczak v. National Electric Products, Corp., 66 N.J.Super. 64, 75, 168 A.2d 412 (App.Div.1961), and O'Sullivan's role to have been no more than the architect and planner, compare Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 675 A.2d 209 (1996), the motion judge granted summary judgments to these defendants in orders entered July 17, 1998 and November 20, 1998.
*1176 Although the question of whether each of these defendants owed Matthew a duty of care under the attendant circumstances may be a close one, we are convinced that in the context of the summary judgment motions, the motion judge erred. In so concluding, we caution that our consideration of the record must be, as should have been the motion judge's, guided by the favorable inferences we must accord plaintiff, even under the more flexible summary judgment standard set forth in Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 523, 666 A.2d 146 (1995). Defendants' contention before us, therefore, that the motion judge's findings in connection with the summary judgments must be accorded the deference due under the rubric of Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974), is misplaced. See Alloway v. Bradlees, Inc., 157 N.J. 221, 232, 723 A.2d 960 (1999).

I.
As presented to the motion judge and viewed most favorably for plaintiff, the record establishes the following. In January 1994, the Board hired O'Sullivan to provide architectural and engineering services in connection with several planned projects at the Hunterdon Central Regional High School. Those projects included installation of a drainage system and an underground electrical system, installation of new scoreboards, and renovation of the school's existing fountain.
There were ultimately several contractors hired to perform the various work required, all pursuant to plans and specifications prepared by O'Sullivan. It is abundantly clear that there was no general or prime contractor per se, and that the projects were scheduled and coordinated by both the responsible on-site Board employees and O'Sullivan. Indeed, the interrogatory answers on behalf of the Board provided by John Stana, who at the time was in charge of the operations and maintenance departments and construction services, and Barry Imbowdin, who was responsible for "coordination of the job and related contractors," portray fairly extensive overseeing activities. As to the excavation project, for instance, according to Stana's interrogatory answers the ongoing supervision of the work was the responsibility of not only Matthew,[1] but also Ken Quabeck, who was the O'Sullivan "project manager." The Board on-site contact person, Barry Imbowdin, was to provide assistance, albeit he was not obligated to "oversee" the project "in the sense of giving instructions to the contractor regarding the performance of the work."
Indeed, there is ample evidence in the record of the presence of both Stana and Imbowdin at the excavation site both before and during the excavation of the trenches and the laying of some of the drainage pipe before the collapse, although neither professed to ever having seen the exposed trenches. Imbowdin admitted to discussing several problems with Matthew, including the inadequacy, given the soil conditions, of the machine Matthew had brought to do the excavation and the problems with "the need for different pipe." And, although as originally bid Countywide would have been responsible for purchasing the necessary materials, the Board insisted on a bid for labor and equipment only. It retained the right, and thus responsibility, to order the appropriate *1177 materials. At the very least, then, its on-site presence was necessary to ensure that the proper materials had been delivered. As acknowledged by Imbowdin in his interrogatory answers, "[g]enerally, Mr. Stana or I would inspect the materials that we had ordered."
As to O'Sullivan's on-site presence, it did not have any contractual obligation for on-site supervision. But the record is fairly clear that, at least prior to commencement of the excavation, its project manager for the job, Ken Quabeck, was at the site on several occasions and examined the area of the excavation. In his interrogatory answers, for instance, Imbowdin recalled "a meeting with Matt and Ken Quabeck in which we discussed where the excavation should begin," albeit this occurred before the excavation began. Whether Quabeck ever observed excavation of the trenches, and what must have been the evident absence of any bracing or supporting structures, is disputed. Quabeck denied in his deposition any on-site presence after commencement of the excavation project; but an affidavit from Robert Shinkle, an employee of Countywide Excavating, suggests to the contrary.
Irrespective of this factual dispute, there is ample evidence in the record that, shortly before the collapse, both the Board representatives on the site and Quabeck were aware that Matthew had had difficulty in commencing and completing the excavation work, at least in part, as a result of the weather, the machinery and the soil conditions. They evidently were aware, too, of the instability of the area, as reflected by the following August 18, 1994, fax from Quabeck to Matthew:
MattI received a call from Barry Imbowdin this morning. He said that you started the trenching yesterday and then left the site. Call and let me know if you encountered a problem, have another job which needs to be finished, etc. I don't know what to tell him. The problem now is that the students are starting on Monday. They had hoped to have the job completed by then. But with the delays and now the rain, you are going to have to provide fencing around the excavation and the H.S. may have to find alternate playing fields.

[Emphasis added.]
In addition to the delays and weather conditions, there was a problem with the drainage pipe material. As we have said, pursuant to the excavation contract, the Board was responsible for providing all materials, including the drainage pipe. The specifications prepared by O'Sullivan called for "perforated 6 [inch] or 8 [inch] corrugated polyethylene plastic under drain pipe." (Emphasis added.) As described by plaintiff in her opposing affidavit, "installation of [corrugated] poly pipe does not require entry into excavated trenches. The pipe is flexible and as portions are laid in a trench, the other end can be kept out of the trench for connection." Mr. O'Sullivan, too, acknowledged as much during his deposition. He described "corrugated pipe," as "pipe that has alternating larger/smaller diameters so it is flexible." He further acknowledged that when [he] created these plans, he was aware the "pipe could have been on the surface and put into the trench."
It is undisputed that the pipe initially ordered by Imbowdin and delivered to the job, apparently after Matthew went to the first supply company to look at the pipe they carried, was not corrugated and was not perforated. It was returned. Imbowdin recalled a discussion with Matthew on the site about the need to order different pipe, but what it was that was the problem with the material initially delivered "was vague." The material he subsequently *1178 ordered was perforated, but not corrugated.[2]
Plaintiff's contention that defendants owed Matthew a duty of care under all of these circumstances is best understood in the context of her own affidavit. At the time of the accident, plaintiff was employed by Countywide Excavation performing clerical, bookkeeping and client contact responsibilities. She stated in her opposing affidavit:
A.J. O'Sullivan Architects, P.A. repeatedly requested Countywide begin excavation. A.J. O'Sullivan Architects, P.A. frequently expressed the desire the project commence as soon as possible. The project initially was delayed due to rain. Accordingly, A.J. O'Sullivan Architects, P.A. reiterated its desire the project be completed by the commencement of the upcoming school year. Due to this pressure, Countywide stopped its work on a separate residential foundation excavation to start this project.
At the beginning of this project, there were further delays due to rain, the necessity of obtaining an excavating machine different from that initially brought to the work site, and the difficulty encountered excavating in shale. A.J. O'Sullivan Architects, P.A. continued to press for job progress.
After commencing excavation, Matt radioed me from the construction site and communicated the wrong pipe had been supplied. A form of PVC pipe with gaskets was supplied.
The supplied PVC pipe was non-flexible and came in 8 to 10 foot lengths.
Matt made multiple attempts to have the correct pipe supplied. However, the proper pipe was never brought to the job.
Matt called A.J. O'Sullivan Architects, P.A. to inform them the wrong piping had been supplied.
Due to the pressure exerted by A.J. O'Sullivan Architects, P.A., and the High School, to continue project progress and use the supplied PVC pipe, Matt proceeded with excavation.
The PVC pipe was difficult to connect. Countywide workers were required to enter the trench to securely join the pipe lengths.
Matt would not have been required to enter the trench to connect pipes had the specified polyethylene pipe been supplied.
Throughout this project Countywide had numerous coordination communications with A.J. O'Sullivan Architects, P.A. employees.
Communications with A.J. O'Sullivan Architects, P.A. employees involved the following: scheduling work; coordinating construction; inquiring as to delays in excavation; demanding job progress; and receiving safety instructions.
Additionally, plaintiff submitted to the motion judge lengthy reports from two *1179 safety experts. Shorn of much of the supporting detail, the essence of each expert was that the unsafe and hazardous condition of the trench was foreseeable. As described by one expert, "the 9 foot deep trench was essentially vertical. It had been accumulating water for several days prior to this incident. Water collecting in a trench is an indication of significant risk of collapse." And both experts observed the absence in the contract of any specifications for bracing or stabilization plans, or diversion ditches or other means of protecting the excavation area from accumulating water, despite the presence, as noted by one of plaintiff's experts, of a high water table and existence of wetlands in the area, a condition obviously known by both defendants. While the contract reposed in the contractor full responsibility for safety, the experts referred to several industry standards, including OSHA regulations, as reposing an overarching safety responsibility in the top layer of supervisors at the construction site. Both thought that defendants, because of their extensive involvement here, were so responsible. Under the attendant circumstances, a juror could conclude that both the Board and O'Sullivan exercised substantial involvement in not only the planning but also the implementation of the project, albeit not the actual work itself, and could also conclude that, given the weather and soil conditions as well as the time pressures imposed, the risk of collapse was quite foreseeable. Given these circumstances, both experts opined that the Board and O'Sullivan had a duty of care to ensure compliance with the necessary safety precautions. They further opined that the duty was breached. There is certainly evidential basis for these opinions. Whether a juror might accept them is another matter.

II.
We set forth the applicable law. As a general matter, a landowner or general contractor has a nondelegable duty to ensure the safety of the premises upon which work is to be performed. Equally so, however, is it generally said that neither is under a duty to protect an employee of an independent contractor or subcontractor from hazards created by the performance of the contracted work. E.g., Gibilterra v. Rosemawr Homes, 19 N.J. 166, 170, 115 A.2d 553 (1955); Rigatti v. Reddy, 318 N.J.Super. 537, 541-42, 723 A.2d 1283 (1999). But where there is evidence of some participation, interference or exercise of some control over the work, a duty of care may fairly be imposed. See Sanna v. National Sponge Co., 209 N.J.Super. 60, 66, 506 A.2d 1258 (App.Div. 1986) ("[w]e conclude that [plaintiff employee of an independent contractor] produced sufficient evidence of [defendants' owner's] control over and participation at the plaintiff's workplace being used at the time of the accident to create a jury question on whether defendant breached its nondelegable duty to make a reasonably safe place to work."); Izhaky v. Jamesway Corp., 195 N.J.Super. 103, 107, 478 A.2d 416 (App.Div.1984). And see Accardi v. Enviro-Pak Systems Co., Inc., 317 N.J.Super. 457, 463, 722 A.2d 578 (App. Div.), certif. denied, 158 N.J. 685, 731 A.2d 45 (1999) ("plaintiff is entitled to have the jury consider whether defendant is liable as a landowner based on the factual dispute as to the control exercised by defendant ..."). Compare Rigatti v. Reddy, supra, 318 N.J.Super. at 543, 723 A.2d 1283 ("[owner] defendant had no control over the roof during its repair. Indeed, when the accident happened there was not a single [owner] employee on the roof. Additionally, defendant [owner] did not provide plaintiff [contractor employee] or plaintiff's employer with any equipment *1180 or tools to perform the work, did not attempt to control or oversee the manner by which the roofing work was to be completed."); Wolczak v. National Electric Products Corp., supra, 66 N.J.Super. at 77, 168 A.2d 412 ("[i]n the absence of interference by either of the defendants [owner and general contractor] in the performance of the independent contractor's work, the duty to insure that the job was performed in a safe manner was solely that of plaintiff employee, [the independent contractor], and its supervisory personnel.").
Moreover, applicable workplace safety regulations may affect the nature and extent of an owner's and general contractor's duty of care. Kane v. Hartz Mountain Indus., 278 N.J.Super. 129, 141-43, 650 A.2d 808 (App.Div.1994), aff'd, 143 N.J. 141, 669 A.2d 816 (1996). See Alloway v. Bradlees, Inc., supra, 157 N.J. at 233-40, 723 A.2d 960. Here, although not raised by the parties and, thus, not considered by the motion judge, plaintiff's experts identify several work place safety regulations that may apply. Since the parties have not, however, raised this issue, we do no more than observe the reference thereto in the experts' reports.
Defendants essentially assert they are merely landowner and architect, respectively, and thus not responsible for a hazard that was created by the performance of the contracted work. Certainly the contractual documents do not identify them as anything more. And we are not sure that the extent of their involvement in the project, particularly with the excavation work, would be enough to clothe them with the mantle of a general or prime contractor. But as we recently observed, "`general negligence principles,' rather than strict categorical analysis, govern tort claims involving worker safety issues." Costantino v. Ventriglia, 324 N.J.Super. 437, 446, 735 A.2d 1180 (App.Div.1999) (quoting Alloway v. Bradlees, Inc., 157 N.J. 221, 235, 723 A.2d 960 (1999)). As observed by the Court in Alloway in the context of the responsibility of a general contractor for the safety of an employee of a subcontractor:
The combination of these several factorsthe foreseeability of harm, the relationship between the parties, and the opportunity and capacity to take corrective actionstrongly supports the imposition of a duty of reasonable care on [the general contractor] to assure the safety of plaintiff on the work site as a matter of fairness and sound policy.
[157 N.J. at 233, 723 A.2d 960 (emphasis added).]
Here, most assuredly the harm was foreseeable. Carvalho v. Toll Bros. and Developers, 143 N.J. 565, 574, 675 A.2d 209 (1996) ("[i]t was readily foreseeable that deep trenches posed the risk that trench walls would collapse and seriously injure workers."). Indeed, defendants have acknowledged foreseeable dangerousness of the trench and the risk of collapse. Moreover, as plaintiff's expert have posited, the danger was particularly acute given the weather and soil conditions that all would have been, and clearly were, aware of.
As to the relationship between the parties, while neither the Board representatives nor O'Sullivan had any contractual on-site responsibilities, a reasonable jury could conclude there was, nonetheless, a substantial on-site relationship. Perhaps not so as to the actual work itself as that was distinctly left to Countywide under the contract. But certainly both defendants exerted control and supervision over the commencement and implementation of the work. And while safety concerns, for the most part, were contractually left to Countywide, both the Board and O'Sullivan exerted *1181 some involvement by requiring Countywide to secure the area for the safety of the students. And, perhaps, not insignificantly, there is the role of the Board, and perhaps to a lesser degree, O'Sullivan, in the supply of the uncorrugated drainage pipe. According to plaintiff's proofs, it was that pipe which required Matthew to descend into the trench. And, undisputably, it was the Board who supplied the uncorrugated pipe. Whether Imbowdin, who ordered the material for the Board, knew that what he was ordering was not what was required under the specifications, is not factually clear. But the specifications themselves are clear and it was the Board's obligation to obtain the proper materials. Plaintiff's affidavit, moreover, would suggest that O'Sullivan, too, was aware that the pipe that was delivered was not corrugated and, thus, necessitated physical entry into the trench, yet insisted on rushing the job.
As to the opportunity and capacity to take corrective measures, it is true that the responsibility for properly bracing the trenches was contractually imposed upon Countywide. It is also true that O'Sullivan had no contractual authority to cease the work. Most assuredly, however, the Board had that authority. Moreover, there is nothing in the record that would suggest the Board and O'Sullivan could not have, at the least, reminded Countywide of the dangers and its contractual obligation to brace the trenches, just as they directed Countywide to provide safety precautions for the students. And, as to the delivery of the uncorrugated pipe, ostensibly that was at the hands of the Board.
O'Sullivan, however, contends Carvalho v. Toll Bros. and Developers, supra, suggests to the contrary. In Carvalho, the Township of West Windsor had hired Bergman Hatton Engineering Associates (Bergman) to prepare plans for the construction of a sewer service. The plans were to provide that trenching and excavation work was to be properly braced and shored, and that the contractor hired to do the work would be responsible therefor. Subsequently, the Township entered into an agreement with Toll Brothers Developers (Toll) to be the general contractor for the sewer project. Toll was to construct the sewer in accordance with the plans prepared by Bergman and was to be responsible for the means and methods of construction. The Township assigned Bergman to be its representative at the work site, and the contract with Toll expressly required Bergman to maintain a full-time on-site inspector "to ensure that the work ... [was] being performed in accordance with the requirements" of the plans. Bergman, however, was to have no control over the means and methods of the job. It did, however, have contractual authority to stop work on the project by directing Toll to cease performance. Toll hired Jude Enterprises (Jude) as the subcontractor for the excavation work. During the course of the work, an employee of Jude was killed when the trench he was working in collapsed. Bergman's inspector was present on the day of the accident. The widow of the worker filed suit against the Township, Toll and Bergman. Bergman was granted summary judgment, which the Supreme Court ultimately reversed. In doing so, the Court said:
The risk of serious injury from the collapse of an unstable trench was clearly foreseeable. Bergman had explicit responsibilities to have a full-time representative at the construction site to monitor the progress of the work, which implicated work-site conditions relating to worker safety. Those responsibilities related to the condition of trenches, the handling of utility lines crossing trenches, and whether measures to shore up and stabilize trenches through *1182 the use of a trench box were necessary. The engineer had sufficient control to halt the work until adequate safety measures were taken. There was sufficient connection between the engineer's contractual responsibilities and the condition and activities on the work site that created the unreasonable risk of serious injury. Further, the engineer, through its inspector, was on the job site every day, observed the work in the trench, and, inferably, had actual knowledge of the dangerous condition.

[Id. at 577-78, 675 A.2d 209.]
O'Sullivan contends its involvement here is quite distinct. And we recognize that its actual presence on the site during the short time that Countywide was excavating the trenches prior to the collapse is quite a bit less than Bergman's involvement, both contractually and actually, in Carvalho. Nonetheless, and for the reasons we have previously set forth, we are convinced there was enough in the summary judgment record to impose a duty of care sufficient to survive summary judgment. As made clear in Carvalho and, more recently, Alloway v. Bradlees, Inc., supra, 157 N.J. 221, 230-32, 723 A.2d 960, the parameters of owners, architects, general contractors and the like for construction site/workplace safety, focuses not so much on how each is characterized, but rather upon their actual participation and the overriding considerations of "fairness and sound policy."

III
In addition to appealing the summary judgment orders, plaintiff appeals certain discovery orders entered March 6, June 16 and July 17, 1998. We have considered the contentions raised in connection with these orders and find them to be without merit and find no abuse of discretion on the part of the motion judge.

IV
We affirm the discovery rules entered March 6, June 16 and July 17, 1998, but reverse the summary judgment orders entered July 17 and November 20, 1998. The matter is remanded for further proceedings consistent with this opinion.
NOTES
[1] The contract between the Board and Countywide Excavation placed upon the excavator the full responsibility for the means and methods of the work to be performed and all safety requirements, including the necessary supports for the trenches that were to be excavated.
[2] We acknowledge that Matthew's written request to the Board for material refers only to "polypipe." We can reasonably infer that he was referring to the corrugated, perforated material required under the specifications. Apparently, however, "polypipe" can be solid, perforated and/or flexible. It may be that, as with the unsafe condition of the trenches, defendants have a viable comparative negligence claim. However, whether they, themselves, have a separate duty of care, is a distinct, and, in the context of a motion for summary judgment, unrelated question. Nonetheless, to some extent, the motion judge resolved the motions in favor of defendants because he viewed Matthew to have been primarily at fault. But that should not have been a consideration in the context of determining the defendants' own duty of care. Wolczak v. National Electric Products Corp., supra, 66 N.J.Super. at 77, 168 A.2d 412.