James O'KEEFE, and Lorraine O'Keefe

v.

SPROUT–BAUER, INC., Bay State Milling Company, a subsidiary of Bay State Milling Co., and John Doe, Golfetto Manufacturing Company Sprout–Bauer, Inc., Third Party Plaintiff,

v.

GIAMMETTA MECHANICAL CONTRACTORS, INC., Third Party Defendant, James O'Keefe, Appellant.

James O'KEEFE, and Lorraine O'Keefe, Appellants,

v.

SPROUT–BAUER, INC., Bay State Milling Company, a subsidiary of Bay State Milling Co., and John Doe, Golfetto Manufacturing Company Sprout–Bauer, Inc., Third Party Plaintiff,

v.

GIAMMETTA MECHANICAL CONTRACTORS, INC., Third Party Defendant.

Nos. 91–5863, 91–5994.

United States Court of Appeals, Third Circuit.

Argued June 18, 1992.

Decided July 20, 1992.

H. Curtis Meanor (argued), Podvey, Sachs, Meanor, Catenacci, Hildner & Cocoziello, A Professional Corp., Newark, N.J., for appellants.

Leonard T. Nuara (argued), Terence W. Camp, Budd, Larner, Gross, Rosenbaum, Greenberg & Sade, P.C. Short Hills, N.J., for appellee Sprout–Bauer, Inc.

Robert M. Leonard (argued), Sheila M. Nugent, Shanley & Fisher, P.C., Morristown, N.J., for appellee Golfetto Mfg. Co.

Before: GREENBERG and NYGAARD, Circuit Judges, and POLLAK, District Judge[*]

## OPINION OF THE COURT

GREENBERG, Circuit Judge.

This appeal from an order entered on October 3, 1991, denying reconsideration of an order for summary judgment entered on June 26, 1991, concerns the duties owed by a general contractor to its subcontractors under New Jersey law and raises questions regarding the "proximate cause" prong of a strict products liability claim based on a duty to warn. Specifically, we must determine whether the district court correctly found that *Wolczak v. National Electric Products Corp.*, 66 N.J.Super. 64, 168 A.2d 412 (App.Div.1961), immunized appellee Sprout–Bauer, Inc., a general contractor, from liability for the injuries suffered by plaintiff James O'Keefe, an employee of a Sprout–Bauer subcontractor. We must also determine whether the district court correctly found that appellee Golfetto Manufacturing Co. did not proximately cause O'Keefe's injuries because even if it failed to warn O'Keefe of the dangerous propen-

[*] Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

sity of its product, this fact was irrelevant in light of O'Keefe's extensive experience in the type of work which resulted in his injury and the manner in which this work is typically performed.[1]

We believe that the district court erroneously transplanted the immunity from vicarious liability bestowed upon a general contractor in *Wolczak* into the "primary liability" setting, and thus improperly absolved Sprout–Bauer of responsibility for its affirmative acts of negligence. In addition, we find that the court impermissibly resolved disputed issues of material fact regarding whether Golfetto's failure to warn O'Keefe proximately caused his injuries. Accordingly, we will reverse the district court's order and remand the case for further proceedings.

## I.

### FACTS AND PROCEDURAL HISTORY

On September 23, 1985, Sprout–Bauer[2] entered into a contract with Bay State Milling Company to serve as the general contractor for the construction of a flour milling plant in Clifton, New Jersey. In that contract, Sprout–Bauer agreed to "design, engineer, and construct" the plant on a "turn key" basis.[3] The contract expressly contemplated that Sprout–Bauer would hire subcontractors to perform different aspects of the construction. To this end, Sprout–Bauer agreed that it would "supervise and direct the Work, using [its] best skill and attention and shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." Sprout–Bauer App. at 45. Sprout–Bauer also agreed to "at all times enforce strict discipline and

good order among [its] employees and shall not employ on the Work any unfit person or anyone not skilled in the task assigned to him." Sprout–Bauer App. at 46. Finally, in a section entitled "SAFETY," Sprout–Bauer agreed that it:

shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work. [Sprout–Bauer] shall take all necessary precautions for the safety of, and shall provide the necessary protection to prevent damage, injury or loss to:

A. all employees on the Work and other persons and organizations who may be affected thereby;

B. all the Work and materials and equipment to be incorporated therein, whether in storage on or off the site;

\* \* \* \* \* \*

[Sprout–Bauer] shall comply with all applicable Laws and Regulations of any public body having jurisdiction for the safety of persons or property or to protect them from damages, injury or loss, and shall erect and maintain all necessary safeguards for such safety and protection.... All damage, injury or loss to any property referred to [above], directly or indirectly, in whole or in part, by [Sprout–Bauer], any Subcontractor, Supplier or any other person or organization directly or indirectly employed by any of them to perform or furnish any of the Work or anyone for whose acts any of them may be liable shall be remedied by [Sprout–Bauer]....

\* \* \* \* \* \*

[Sprout–Bauer] shall designate a responsible representative at the site whose duty shall be the prevention of accidents.

---

1. O'Keefe's wife Lorraine joined in the action asserting a claim for loss of consortium. When summary judgment was granted against O'Keefe, her claim was accordingly dismissed, and she also appeals. As a matter of convenience, we will refer simply to O'Keefe as the plaintiff and appellant.

   Sprout–Bauer has moved to dismiss the appeal. For reasons discussed at part III of this opinion, *infra,* we will deny that motion.

2. The record indicates that Koppers Company, Inc. actually entered into the contract with Bay State Milling Company through its Sprout–Waldron Division. Sprout–Bauer App. at 43. The record is unclear as to whether Koppers or Sprout–Waldron was renamed Sprout–Bauer, but the parties do not dispute that Sprout–Bauer served as the general contractor on this project.

3. A "turn key" basis signifies that, at the completion of the project, the plant would be ready for operation.

This person shall be [Sprout–Bauer's] superintendent unless otherwise designated in writing by [Sprout–Bauer] to [Bay State].

Sprout–Bauer App. at 65–66.

Golfetto, an Italian corporation, entered into a subcontract with Sprout–Bauer to manufacture and supply all of the flour milling equipment, piping, ducting, instrumentation, and design services related thereto. Sprout–Bauer Br. at 7. Golfetto manufactured the equipment and component parts in Italy, and then packaged the equipment in crates which were sent to the United States and stored in Brooklyn, New York. Sprout–Bauer App. at 275; 347.

Giammetta Mechanical Contractors, Inc., O'Keefe's employer, entered into a subcontract with Sprout–Bauer to serve as the mechanical subcontractor on the flour mill project. Sprout–Bauer Br. at 9. As the mechanical subcontractor, Giammetta agreed to rig and install the flour milling equipment and associated piping and ducting. The Giammetta subcontract provides, in pertinent part:

[Giammetta] shall provide all materials, supervision, union labor, services, construction equipment, tools, consumables, supplies, testing and test devices, warehousing on and off site, temporary facilities, off load, sort and stage equipment either at their facility or at site, dispose of all dunnage, [and] clean-up work areas as necessary.... The work shall encompass:

A) *Equipment Installation*—Completely install all equipment items as identified in the equipment listings A to M....

Giammetta shall be responsible for the logistics of picking up the Golfetto equipment stored in Brooklyn and hauling, sorting-out, placing and final setting of the equipment. All other equipment shall be delivered to the jobsite by others and turned over to Giammetta for staging, setting, etc.

Sprout–Bauer App. at 135–36.

As part of its manufacturing responsibilities, Golfetto built a "plansifter" which is a device used to sift flour. The plansifter is composed of three major components, including two flour boxes and a center section component. Sprout–Bauer App. at 178–236. The center section component is a steel frame which contains an eccentric weight ("the counterweight") that rotates around a vertical axis. Sprout–Bauer App. at 174–236; 312; 343. The center section component is approximately seven feet high by eight feet wide and is two and one-half feet deep. This component weighs approximately 3,000 pounds, the counterweight being the heaviest part. Sprout–Bauer App. at 174–236; 312.

Golfetto shipped the plansifter to Brooklyn, New York, in numerous crates. To prevent rotation of the counterweight during the shipment of the center section component, Golfetto wedged pieces of wood between the counterweight and the steel frame. As stated by Paolo Panzavolta, Golfetto's Sales Engineer, Golfetto used the wood pieces to "stop mobilization of the counterweight, to stop any rotation of the counterweight." Sprout–Bauer App. at 348. Indeed, Sprout–Bauer concedes in its brief that the wood pieces "ensure the stability of the center section component during ocean transport *and, ultimately, during rigging*." Sprout–Bauer Br. at 13 (emphasis supplied). As is apparent, Golfetto did not intend these wooden pieces to be removed during the rigging process.

After the equipment arrived in Brooklyn, Giammetta performed the rigging work, which included hauling the equipment and its component parts to the Bay State site in Clifton, New Jersey, and unloading, sorting-out and staging the equipment and parts in a warehouse. Sprout–Bauer App. at 298. The Giammetta riggers removed the center section component from the crate and, in doing so, also removed the wood pieces necessary to stabilize the counterweight. Sprout–Bauer App. at 259. The riggers then loaded the components of the plansifter on a flatbed truck and drove them to the side of the mill building so that they could lift the parts by crane and forklift. Sprout–Bauer App. at 298.

On July 21, 1987, while the rigging crew was in the process of hoisting the equip-

ment so that they could install it,[4] the counterweight became unbalanced and the riggers dropped the center section component, which severely injured O'Keefe's right leg and killed Joseph Quatrochi, another member of the rigging crew. Sprout–Bauer App. at 286.

On February 19, 1988, O'Keefe filed a complaint against Sprout–Bauer in the Superior Court of New Jersey, alleging, *inter alia*, that Sprout–Bauer had failed to exercise reasonable care in the control and maintenance of the project and had unreasonably failed to engage supervisors to assist Giammetta in the installation of the plansifting machinery.[5]

On April 5, 1988, Sprout–Bauer removed the suit to the United States District Court for the District of New Jersey based on diversity of citizenship. Subsequently, O'Keefe amended his complaint by adding Bay State as a defendant and charging that it had failed to maintain the mill in a reasonably safe condition. Sprout–Bauer App. at 23.

On May 18, 1989, O'Keefe again amended his complaint, adding Golfetto as a defendant and alleging that it had failed to provide proper instructions concerning the installation of the plansifter, and had defectively designed the packing crates containing the center section component. Sprout–Bauer App. at 27–28.[6] On May 31, 1991, the court dismissed O'Keefe's claims against Bay State and that dismissal has not been appealed.

On June 26, 1991, the court granted summary judgment in favor of Sprout–Bauer and Golfetto. The court held that Sprout–Bauer was not liable under a theory of primary or vicarious liability, as O'Keefe's injury had resulted from an inherent risk of the job which Sprout–Bauer had no duty to prevent. Moreover, it held that Sprout–Bauer did not have a duty to warn Giammetta of the dangerous propensity of the center section component as that risk was obvious. Further, it found that Giammetta had received the instructions and warnings relating to the center section component and that, even if it had not, this would be of no consequence as Giammetta would not have followed the written instructions. The court also underscored that Sprout–Bauer had relinquished all control over the project to Giammetta and its "obligation ended with providing a reasonably safe place to work." Sprout–Bauer App. at 442. Finally, the court held that Sprout–Bauer had not hired Giammetta with the knowledge that it was incompetent and could not safely execute the job.[7]

With regard to Golfetto, the court stated that O'Keefe had failed to allege that it had defectively designed the crates containing the plansifter or had improperly packaged that equipment. In addition, the court found that, even if Golfetto had not sent adequate instructions to Giammetta regarding the plansifter, it was not liable for O'Keefe's injuries as the riggers were subjectively aware of the dangerous propensity of the center section component.

---

**4.** Although Sprout–Bauer has argued that the riggers were moving the equipment at the time of the accident, not "installing" it, this statement is contrary to the testimony of Jack Philbin, the foreman of Giammetta's rigging crew, who supervised the rigging and installation of the plansifter. Philbin testified that "we were in the processing of installing" the parts to the plansifter at the time of the accident. Sprout–Bauer App. at 286. This testimony is fully consistent with Giammetta's subcontract with Sprout–Bauer, where it agreed to rig and "install" the equipment. Sprout–Bauer App. at 135–36. This distinction, however, is not of any consequence in deciding this appeal.

**5.** O'Keefe amplified this allegation during the summary judgment proceeding, arguing that

Sprout–Bauer had breached this duty by (1) negligently furnishing Giammetta with a defectively designed product and (2) negligently failing to warn Giammetta of the defective condition of the plansifter.

**6.** In our recitation of the procedural history, we have omitted the claims among the defendants.

**7.** The district court's opinion is at odds with the one issued in *Quatrochi v. Bay State Milling Co.,* No. 88–2621 (D.N.J. September 25, 1990), denying Sprout–Bauer's motion for summary judgment in a case arising from the same accident. Although the appellees correctly observe that the records in the two cases are not *per force* identical, it is clear that the opinions offer conflicting analyses of the law in this area.

On July 9, 1991, O'Keefe moved for reconsideration of the court's order, but the court denied that request in an order entered October 3, 1991. O'Keefe has appealed from the order of October 3, 1991.[8] We have jurisdiction under 28 U.S.C. § 1291.

## II.

## LIABILITY ISSUES

■ O'Keefe argues that the district court committed several errors in granting summary judgment in favor of Sprout–Bauer and Golfetto. Many of his contentions, however, concern one basic question: did the district court fail to follow Fed. R.Civ.P. 56, which requires the court to construe the evidence on a motion for summary judgment in the light most favorable to the non-moving party? Our review, which is essentially of the order granting summary judgment, is plenary. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir.1992).

## A. SPROUT–BAUER'S LIABILITY:

■ Before embarking on an analysis of whether Sprout–Bauer may have breached a duty owed to O'Keefe, and whether that breach may have proximately caused O'Keefe's injuries, we must first determine what duties are owed by a general contractor to its subcontractors and their employees under New Jersey law.[9] As the district court correctly observed, a general contractor may be held liable on a theory of vicarious liability, or because of its own negligent actions. These two theories starkly differ from one another, for under a vicarious liability regime, a defendant is held responsible for the negligent acts of another, while under a primary liability regime, a defendant is simply accountable for its own tortious acts. In the district court's view,

Sprout–Bauer was not liable under either theory.

### 1. Vicarious Liability:

■ The general rule in New Jersey, as in most jurisdictions, is that an owner who hires an independent contractor is not liable for the negligence of that contractor and any harm resulting therefrom. As stated most succinctly in *Majestic Realty Associates, Inc. v. Toti Contracting Co.*, 30 N.J. 425, 430–31, 153 A.2d 321, 324 (1959), "where a person engages a contractor, who conducts an independent business by means of his own employees, to do work not in itself a nuisance ... [such person] is not liable for the negligent acts of the contractor in the performance of the contract." This statement remains the law today. *See, e.g., Cassano v. Aschoff*, 226 N.J.Super. 110, 113, 543 A.2d 973, 975 (App.Div.) ("one who hires an independent contractor is not responsible for the latter's negligent acts"), *certif. denied*, 113 N.J. 371, 550 A.2d 476 (1988); *Corleto v. Shore Memorial Hospital*, 138 N.J.Super. 302, 307, 350 A.2d 534, 537 (Law Div.1975) ("in general, where one is charged with liability for the negligence of another it is a good defense that the person doing the ultimate harm was an independent contractor rather than an employee of the one sought to be charged"); *Marion v. Public Service Electric & Gas Co.*, 72 N.J.Super. 146, 153, 178 A.2d 57, 60 (App.Div.1962) (same).

■ This general principle also immunizes a general contractor who has hired an independent subcontractor from vicarious liability. As the court in *Wolczak v. National Electric Products Corp.*, 66 N.J.Super. at 70, 168 A.2d at 414–15, observed:

The liability of a general contractor to employees of subcontractors performing construction or other work on the prem-

---

**8.** The original notice of appeal omitted Lorraine O'Keefe as an appellant but an amended notice of appeal was filed on her behalf pursuant to an order of the district court extending the time to appeal. While the amended notice of appeal was filed beyond the date fixed in the order extending the time for appeal, we are satisfied that it should be treated as timely, as it was filed on the same day that the order allowing the extension was filed, as there was a delay in the

filing of that order. Furthermore, the appeal was within the period allowed by Fed.R.App.P. 4(a)(5).

**9.** The district court applied the law of New Jersey in this diversity of citizenship case, and the parties have not objected to the application of this law.

ises is founded in part on the assumption that the owner has placed the general contractor in physical control of the job site.... Absent physical control over the job location or direction of the manner in which the delegated tasks are carried out, the general contractor is not liable for injuries to employees of the subcontractor resulting from either the condition of the premises or the manner in which the work is performed.... Nor is his immunity disturbed by the exercise of merely such general superintendence as is necessary to insure that the subcontractor performs his agreement.

Under the vicarious liability regime, the only duty imposed upon a general contractor who has hired an independent subcontractor is to ensure that the premises on which the subcontractor performs its work are in a reasonably safe condition. *Wolczak v. National Electric Products Corp.*, 66 N.J.Super. at 70, 168 A.2d at 415 ("the general contractor is burdened with a duty similar to that owed by the landowner to business invitees, to exercise reasonable care to maintain the premises in a reasonably safe condition"). In this vein, although a general contractor must provide a reasonably safe workplace, it is not required to eliminate all the potential hazards of the job performed by the subcontractor. *Id.* at 75, 168 A.2d at 417. In addition, vicarious liability may be inappropriate "when the invitee is an experienced laborer hired either to correct the very danger present or to perform his tasks amidst the visible hazards...." *Id.*

There are three main exceptions to the general rule recognized in *Majestic* and further refined in *Wolczak*. First, if an owner or general contractor hires an "independent" contractor but retains control over the manner in which the work is performed, it may properly be held vicariously liable. *Majestic Realty Associates, Inc.*, 30

N.J. at 431, 153 A.2d at 324. *See also Wolczak*, 66 N.J.Super. at 70–71, 168 A.2d at 415 ("supervision of or active participation in the manner of work of the subcontractor may result in the imposition of a broader duty of care, premised essentially on the emergence of a sufficient degree of detailed superintendence over the latter's employees as to invoke a legal relationship analogous to that of master-servant"). *Accord, Cassano*, 226 N.J.Super. at 113, 543 A.2d at 975; *Sanna v. National Sponge Co.*, 209 N.J.Super. 60, 66, 506 A.2d 1258, 1261 (App.Div.1986). In this case, O'Keefe has not alleged that Sprout–Bauer is vicariously liable on a theory that, *by its actions*, it assumed the duty to supervise the rigging and installation and negligently exercised that duty. Rather, O'Keefe has asserted that Sprout–Bauer assumed a direct *contractual* duty to supervise the project and breached that duty.[10] Thus, there is no need to examine at this juncture whether Sprout–Bauer assumed a level of control over the project as to render it vicariously liable.[11]

Second, an owner or general contractor knowingly hiring an incompetent independent contractor may be held liable for the negligent actions of such contractor. *Majestic Realty Associates, Inc.*, 30 N.J. at 431, 153 A.2d at 324; *Cassano*, 226 N.J.Super. at 113, 543 A.2d at 975. However, the district court found that there is simply no evidence to support the argument that Sprout–Bauer hired Giammetta with the knowledge that it was incompetent or could not safely execute the job, and we agree.

Finally, where the work performed by a subcontractor constitutes a nuisance *per se*, the owner or general contractor may be liable provided that the injured party falls within a protected class of plaintiffs. *Compare Rodrigues v. Elizabeth-*

10. *See infra* at subsection c.

11. Although O'Keefe has not chosen to pursue this theory of liability, the record indicates that Sprout–Bauer maintained control over the rigging operations. For example, Philbin testified that Giammetta wished to move the plansifting equipment with a forklift but the Sprout–Bauer

officials would not permit him to do so. Philbin stated, "I told my boss what I wanted to do and then it was his responsibility to get an okay and he came back and said they wouldn't let us do it. The floor won't take the weight." Sprout–Bauer App. at 294.

*town Gas Co.,* 104 N.J.Super. 436, 444, 250 A.2d 408, 413 (1969) ("[a]ssuming without deciding that New Jersey would include employees of independent contractors" within the class of plaintiffs protected under the nuisance *per se* rule) *with Donch v. Delta Inspection Services, Inc.,* 165 N.J.Super. 567, 575, 398 A.2d 925, 929 (1979) ("when a party engages an independent contractor to carry on an activity which by its very nature involves a peculiar or high risk of harm to the contractor's employees, the activity is not inherently dangerous *as to such parties* within the *Majestic Realty* nondelegability exception.") (emphasis in original). Although O'Keefe has argued that the rigging and installation of the center section component involved a peculiar risk of which the riggers were not aware, he has not asserted that the rigging work involved constituted a nuisance *per se.*

■ Based on the above rules and exceptions, the district court determined that Sprout–Bauer was not liable for the damages resulting from O'Keefe's injuries. Essentially, the court determined that, because Sprout–Bauer had maintained the site in a reasonably safe condition, it satisfied all the duties imposed upon it regarding the welfare of its subcontractors. The flaw in this reasoning is that O'Keefe does not ground his assertion that Sprout–Bauer is liable on a theory of vicarious liability, but has asserted that Sprout–Bauer is liable because it committed distinct acts of negligence that proximately caused the accident. While the district court purported to analyze Sprout–Bauer's "primary" liability, it did so under the above framework and thereby improperly transplanted the immunity from vicarious liability bestowed upon one who hires an independent contractor or subcontractor into the "primary" liability context.

Hence, while the court agreed that Sprout–Bauer "had a duty to provide a reasonably safe workplace for the employees of its subcontractors," it underscored that there are "limitations as to the extent of the duty owed" by Sprout–Bauer. Sprout–Bauer App. at 437. Specifically,

the court observed that "[w]hat precautions are 'reasonable' depends on the particular risk of harm and the practicality of preventing it" and that " 'liability does not extend to employees of an independent contractor whose injury results from the very risks which are inherent to the work they were hired to perform.' " Sprout–Bauer App. at 437–38 (quoting *Cassano v. Aschoff,* 226 N.J.Super. 110, 115, 543 A.2d 973, 976 (1988)). As a result, the court concluded that there were no genuine issues of material fact to warrant a denial of Sprout–Bauer's motion for summary judgment:

> Mr. O'Keefe was a 'rigger' employed by Giammetta. He was injured while he and the other riggers were placing the center component of one of the Golfetto sifters into place. This is precisely the job for which Mr. O'Keefe was hired. Furthermore, he had nearly thirty years experience as a rigger ... and therefore was aware of any and all risks inherent in the job. Mr. O'Keefe's supervisor, working that day of the accident, testified that the component part in question was 'heavy, we all knew it. It's dangerous to move it, and they would tip over. So, we had to be careful.' ... Thus, Sprout–Bauer had no duty to protect against this accident because it is an injury resulting from the inherent risks of the job he was hired to perform.

Sprout–Bauer App. at 439.

In our view, while the complaint is not completely clear, we are satisfied that O'Keefe has sued Sprout–Bauer on the ground that Sprout–Bauer committed its own negligent acts in (1) furnishing Giammetta a defectively designed product; (2) failing to warn Giammetta of the risk associated with the center section component; and (3) failing to supervise properly the installation of the center section component. Sprout–Bauer App. at 7–8. As we discuss below, a general contractor may be held primarily liable for these acts and omissions. Thus, there was no need to evaluate whether Sprout–Bauer should be held liable based on a theory of vicarious

liability.[12] But even if vicarious liability were the sole basis on which to hold Sprout–Bauer liable, the district court still mistakenly assumed that, because O'Keefe was injured *while rigging*, the injury resulted from an inherent risk of the job. Indeed, this assumption begs the question posed. The critical inquiry concerns whether the accident was in fact merely a function of the job, or whether it could have been avoided if proper warnings had been given to Giammetta or if the project had been properly supervised. Moreover, it is doubtful that O'Keefe, although obviously an experienced rigger, was "aware of *any and all risks inherent in the job*," including the dangerous propensity of a component of a machine that he had never seen before. These questions should be resolved by a jury.

## 2. Primary Liability:

Beyond a general contractor's duty to provide reasonably safe working conditions, and aside from the exceptions to the general rule barring vicarious liability on the part of a general contractor for the negligence of its subcontractors, a general contractor must also act in accordance with the traditional rules of tort law. In this case, O'Keefe charges that Sprout–Bauer committed its own negligent acts in furnishing a defective product, failing to warn

Giammetta regarding the dangerous propensity of the center section component, and failing to supervise properly the rigging and installation of the equipment.

### a. Duty to Furnish Non-Defective Equipment:

Under New Jersey law, a general contractor may be held liable for negligently supplying defective materials to its subcontractor.[13] *Piro v. Public Service Electric & Gas Co.*, 103 N.J.Super. 456, 247 A.2d 678 (App.Div.), *aff'd*, 53 N.J. 7, 247 A.2d 667 (1968), is illustrative. There, the plaintiff, an employee of an independent contractor who was injured while assisting in the operation of an electric saw, brought an action against Public Service Electric & Gas Company, which had hired the independent contractor. The plaintiff alleged that the defendant had negligently failed to provide the independent contractor with a saw containing sufficient safety devices and had further failed to maintain a reasonably safe workplace. The jury entered a verdict in the plaintiff's favor and Public Service appealed, arguing that, even if the saw or the workshop were inadequately safeguarded, this did not warrant the imposition of liability upon it because it was immune under the principles set forth in *Wolczak*. The Appellate Division disa-

**12.** In any event, *Meder v. Resorts International Hotel, Inc.*, 240 N.J.Super. 470, 573 A.2d 922 (App.Div.1989), and *Bortz v. Rammel*, 151 N.J.Super. 312, 319, 376 A.2d 1261, 1264–65, *certif. denied*, 75 N.J. 539, 384 A.2d 518 (1977), cast doubt on the viability of the reasoning set forth in *Wolczak* in some contexts. According to *Meder*, New Jersey legislation codified in the Construction Safety Act rejected to some extent the immunity bestowed upon landowners and general contractors in *Wolczak*. Although New Jersey subsequently repealed regulations adopted pursuant to the act in favor of the Federal Occupational Safety and Health Act of 1970 ("OSHA"), 29 U.S.C. § 651 *et seq.*, *Meder* noted that the New Jersey Construction Safety Act remained in effect. Further, it concluded that OSHA imposed liability upon general contractors beyond that permitted in *Wolczak*. It additionally underscored that "[t]he fact that New Jersey has ceded regulation of occupational safety and health to OSHA does not in any way affect the public policy" expressed in the repealed regulations imposing greater liability

upon landowners and general contractors than did *Wolczak*. 240 N.J.Super. at 477, 573 A.2d at 926. *See also Ries v. National R.R. Passenger Corp.*, 960 F.2d 1156 (3d Cir.1992) (dealing with the effect of an OSHA violation in an FELA action).

**13.** Sprout–Bauer argues that O'Keefe failed to advance this theory before the district court. Yet O'Keefe's complaint states that Sprout–Bauer was liable for damages resulting from its failure to "exercise that degree of control, care and maintenance necessary for the safe installation of the machinery...." Sprout–Bauer App. at 7. Obviously, if Sprout–Bauer had a duty to ensure the safe installation of the machinery and it provided Giammetta with defectively designed machinery, such action would be a violation of its duty. However, Sprout–Bauer is correct that O'Keefe is limited to asserting that Sprout–Bauer *negligently* provided defective machinery, as he failed to raise a strict liability claim against Sprout–Bauer before the district court.

greed, and concluded that Public Service had misunderstood the gravamen of plaintiff's complaint, noting "[t]his is *not* a case in which plaintiff seeks to hold defendant responsible for injuries caused by the negligence of an independent contractor in the performance of its operations, but for defendant's own failure to fulfill the duty cast on it as a landowner to provide a safe place of employment for the contractor's employees." *Id.* 103 N.J.Super at 463, 247 A.2d at 682 (emphasis in original). Since the plaintiff had alleged that Public Service had acted negligently in supplying a defective saw and unsafe working conditions, there was no need to consider its liability based on the negligent acts of others.

■■■ In addition, the *Wolczak* decision, on which the district court so heavily relied, explicitly recognized that "specific instances of direct interference which proximately cause injury to the employees of the subcontractor—*such as the furnishing of defective materials* ... or the giving of a single authorized direction thwarting the subcontractor's effort to provide safeguards" will forfeit the general contractor's limited immunity from liability. *Wolczak*, 66 N.J.Super. at 71, 168 A.2d at 415 (emphasis supplied). *Accord Meny v. Carlson*, 6 N.J. 82, 99, 77 A.2d 245, 253 (1950) (where general contractor assumed the duty of providing scaffolding to independent contractor, it owed a duty to furnish reasonably safe scaffolding); *Izhaky v. Jamesway Corp.*, 195 N.J.Super. 103, 106, 478 A.2d 416, 418 (App.Div.1984) (observing that the immunity set forth in *Wolczak* was of no avail to a general contractor who has furnished defective materials to a subcontractor).[14]

Because the district court believed that "[t]he plaintiffs do not claim that the machinery was defectively designed or improperly crated," Sprout–Bauer App. at 447, it did not rule on whether Sprout–Bauer had acted negligently in furnishing such equipment. Yet O'Keefe *did* put forth evidence supporting his claim that the plansifter was defectively crated. For example, he submitted deposition testimony of Herbert Aronson, an engineer, who testified that "there was something wrong with the packing, the way it was packed and the way it was handled." Sprout–Bauer App. at 390. Aronson further testified that "the equipment was crated in such a way ... i[n] that the eccentric shaft was wedged within two-by-fours." Sprout–Bauer App. at 392–93. He further stated that the two-by-fours could be removed by the party installing the machine, although their removal would create an inherent instability in the machine. Sprout–Bauer App. at 394. This evidence is sufficient to demonstrate that O'Keefe did not drop his design defect claim.[15]

Thus, on remand, the court should evaluate the merits of this claim. If it finds that there are genuine issues of material fact concerning whether the crates were defectively designed, and if it determines that there are genuine issues of material fact concerning whether Sprout–Bauer negligently furnished the equipment, then summary judgment in Sprout–Bauer's favor would be inappropriate.

### b. *Duty To Warn of Known Risk:*

■■■ A general contractor who hires a subcontractor can also be held liable for failing to warn the subcontractor of a peculiarly dangerous aspect of work or that a chattel used by the subcontractor is or might be dangerous. For example, in *Bergquist v. Penterman*, 46 N.J.Super. 74, 134 A.2d 20 (App.Div.), *certif. denied*, 25 N.J. 55, 134 A.2d 832 (1957), a landowner hired several independent contractors, including a floor-finishing contractor, to perform various tasks on a major construction project. The decedent, an employee of the

---

**14.** Section 392 of the Restatement (Second) of Torts (1965) similarly imposes liability on a supplier of a dangerous chattel if the supplier fails to exercise reasonable care to make the chattel safe or to discover the chattel's dangerous condition and inform the user of that condition. *See infra* at section b and n. 17.

**15.** Apparently, the district court relied on the deposition testimony of Pedro J. Tavares, O'Keefe's expert witness, who testified that he did not believe that the plansifter was improperly crated. Sprout–Bauer App. at 386.

floor-finishing contractor, died during an explosion that occurred on the job, and decedent's wife brought a negligence action against the landowner. The trial court determined that the landowner was immune from liability because the decedent worked for an independent contractor. The Appellate Division reversed and set forth a clear exposition of the primary liability of landowners and general contractors in this situation:

> An employer will be held for his own wrong ... [H]e may have been negligent in hiring unskillful and improper persons as contractors, ... giving the contractor poor instructions or faulty equipment, ... or failing in his duty to inspect the work which the contractor has been employed to do.... *The employer of an independent contractor will also be held liable if the work was of a kind which the employer should have recognized would during its progress necessarily create the danger of the mishap which occurred, and thus contained or involved an unreasonable or peculiar risk of bodily harm to plaintiff unless special precautions were taken.*

*Id.* 46 N.J.Super. at 84, 134 A.2d at 25 (emphasis supplied). *See also* Restatement (Second) of Torts § 413 (1965).

Since the facts in *Bergquist* suggested that the landowner might have been required to warn the decedent of the known risk, the court held that the trial court erred in directing a verdict in the defendant's favor.

The court engaged in a similar analysis in *Izhaky v. Jamesway Corp.*, 195 N.J.Super. 103, 478 A.2d 416. There, an employee of an electrical contractor brought a tort action against the employer of that contractor for damages suffered while the employee was installing electrical outlets, arguing that the defendant had repositioned the

wires and thereby created a potentially dangerous situation, but had failed to so inform the plaintiff. The jury found in favor of the plaintiff and the employer appealed. On appeal, the employer contended that *Wolczak* insulated it from liability since the hazard that occurred was incidental to the nature of electrical work, and thus the trial court had erred in sending the case to the jury. The Appellate Division affirmed, and held that the jury was entitled to determine whether the injury had resulted from an "operational hazard" or from the defendant's negligent failure to warn the plaintiff of the potential danger resulting from its repositioning of the wires.

Moreover, section 388 of the Restatement (Second) of Torts (1965) expressly imposes liability on a supplier of a dangerous chattel for failing to warn the person to whom the chattel is supplied of its dangerous condition, so long as the supplier has reason to know that this person will be unaware of the danger:

> One who supplies ... a chattel for another to use is subject to liability ... if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous ... and
>
> (b) has no reason to believe that [plaintiff] ... will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform [plaintiff] of its dangerous condition.

Importantly, a general contractor who furnishes equipment for use by a subcontractor is a "supplier" for purposes of liability under section 388. *See* Comment c, section 388; *see also* Comment a, section 391.[16]

---

**16.** Section 392 of the Restatement (Second) of Torts (1965) also imposes liability upon a supplier for its failure to warn a user of a product's dangerous condition. It provides:

> One who supplies to another, directly or through a third person, a chattel to be used for the supplier's business purposes is subject to liability to those for whose use the chattel is supplied, or to those whom he should expect to be endangered by its probable use, for

physical harm caused by the use of the chattel in the manner for which and by persons for whose use the chattel is supplied

> \* \* \* \* \* \*
>
> (b) *if* [*the supplier*] *fails to exercise reasonable care to discover its dangerous condition or character, and to inform those whom he should expect to use it.*

(emphasis supplied).

■ An application of the "duty to warn" principles set forth in *Bergquist* and *Izhaky* and codified at section 388 of the Restatement confirms that the district court erred in granting summary judgment in Sprout–Bauer's favor. O'Keefe alleged, and Sprout–Bauer does not dispute, that Golfetto had mailed to Sprout–Bauer a packet of information containing warnings with respect to the handling of the center section component. Sprout–Bauer App. at 440. Those warnings stated: "DO NOT DISASSEMBLE ANY STRUCTURAL PART OF THE MACHINE WITHOUT THE SPECIFIC GUIDE OF OUR ENGINEER." Sprout–Bauer App. at 211. The warning further declared:

> WARNING: before starting the disassembly operations, insert some wooden blocks under the counterweight, which supports the weight of the whole drive unit, in order to prevent it from falling down when the upper ring-nut (17) is unloosened.

Sprout–Bauer App. at 214.

O'Keefe thus reasonably argued that Sprout–Bauer knew that the rigging and the installation of the plansifter involved a peculiar risk and it should have informed Giammetta of this risk and ensured that special precautions were taken. Further, O'Keefe asserted that Sprout–Bauer knew that the wooden pieces should not have been removed from the crates and should have informed Giammetta of this fact. According to O'Keefe, Sprout–Bauer's failure to relay this information proximately caused O'Keefe's injuries.

■ The district court disagreed with this analysis for three reasons. First, the court found that the accident resulted from an inherent risk of the job O'Keefe was hired to perform and thus held that Sprout–Bauer's failure to relay these cautionary instructions was irrelevant. However, it is for the jury to determine whether the injury stemmed from an inherent risk of the job, or whether it resulted from Sprout–Bauer's failure to warn of the dangerous propensities of the center section component and the peculiar risks associated with its installation. As noted in *Michalko v. Cooke Color & Chemical Corp.*, 91 N.J. 386, 402, 451 A.2d 179, 187 (1982), "[t]he question whether the failure to warn proximately caused plaintiff's injury is a factual dispute that the jury should decide."

■ Second, the court determined that Sprout–Bauer had no duty to relay the information because Giammetta had in fact received the warnings, as Golfetto had mailed them in a separate crate along with the machinery. It thus relied on Panzavolta's testimony that "[a]ll instruction was [given] to Sprout–Bauer before and another copy for the final customer was crated, all of them in a single crate." Sprout–Bauer App. at 440. Yet O'Keefe testified that he did not observe any safety instructions when he unpacked the crates. Sprout–Bauer App. at 322. He further testified that, if Jack Philbin, the foreman of Giammetta's rigging crew, had been instructed regarding how to safely rig or install the equipment, he would have informed the riggers. Sprout–Bauer App. at 328. Finally, the report of Pedro J. Tavares, O'Keefe's expert witness, states that O'Keefe testified that "no instructions were given on how to handle" the center section component. Sprout–Bauer App. at 260. This evidence reasonably supports the conclusion that Giammetta did not in fact receive the instructions and thus creates an issue of fact that the jury should resolve. Further, there is no indication in the record that Sprout–Bauer did not relay the safety instructions and warnings to Giammetta because it believed that Giammetta had received them.[17]

---

**17.** In any event, Golfetto does not dispute that it did not place the instructions or warnings regarding the center section component in the crates that contained that equipment, but rather contends that it crated the instructions in a separate box.

The district court also rejected O'Keefe's contention that Sprout–Bauer was liable because the warnings were deficient on the ground that they were not "within the control of Sprout–Bauer nor within its duty to provide." Sprout–Bauer App. at 440. However, Sprout–Bauer does not dispute that it received the detailed

■ Finally, the district court held that, even if Sprout–Bauer had provided the proper instructions and warnings to Giammetta, Giammetta would not have read them and would not have adhered to them. For this reason, Sprout–Bauer's omission could not have caused O'Keefe's injury. In the court's words: "if Sprout–Bauer provided complete, clear instructions manuals, ... the workers would not have taken [sic] instruction...." Sprout–Bauer App. at 441. However, Philbin testified that "Golfetto ... sent a book with pictures in it, and that would [be] more or less what I went by." O'Keefe App. at 71. *See also* Sprout–Bauer App. at 284–85. Since Philbin adhered to the only instructional booklet he claims to have received from Golfetto, it is reasonable to infer that he might have also adhered to the warning concerning the center section component if that warning had been provided.[18] Hence, the court's contrary factual finding in this regard is inappropriate in this summary judgment proceeding.

#### c. *Duty to Supervise Rigging:*

■ According to O'Keefe, Sprout–Bauer breached its duty to supervise properly the rigging and installation of the plansifter and is liable for damages related to O'Keefe's injuries on this basis.

In its contract with Bay State, Sprout–Bauer agreed to "supervise and direct the Work, using [its] best skill and attention and ... shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." Sprout–Bauer App. at 45. In addition, the contract set forth that Sprout–Bauer:

> shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with Work. [Sprout–Bauer] shall take all necessary precautions for the safety of, and shall provide the necessary protection to prevent damage, injury or loss to:
>
> A. all employees on the Work and other persons and organizations who may be affected thereby....

Sprout–Bauer App. at 65–66. Finally, the contract states: "Contractor shall designate a responsible representative at the site whose duty shall be the prevention of accidents." Sprout–Bauer App. at 67. These provisions indicate that Sprout–Bauer agreed to assume a duty to protect the subcontractors' employees and to supervise all programs, including the rigging and installation of the plansifter.[19]

The record demonstrates that Sprout–Bauer may have breached its duty to supervise the project. As the district court not-

---

instructions set forth above. Indeed, John Schofield, an employee at Sprout–Bauer, testified that he was "aware of the Golfetto instruction manuals ... and ... reviewed" them. Sprout–Bauer App. at 427. Sprout–Bauer's potential liability, unlike that of Golfetto, stems from its duty to relay to Giammetta the information it concedes to have possessed, not from the allegedly deficient nature of the warnings.

**18.** Sprout–Bauer also argues that its failure to relay to Giammetta the contents of the warnings is irrelevant because the accident occurred during rigging and hoisting and not disassembly, the subject of the warning. However, based on the fact that the accident occurred, it is reasonable to infer that the same danger posed during disassembly exists during rigging and installation. Thus, if Giammetta had received and reviewed the warnings, it might have become aware of the necessity of the wood pieces. *See* O'Keefe Reply Br. at 8–9. Indeed, as previously noted, Sprout–Bauer's brief states that the wood pieces were necessary to "ensure the stability of

the center section component during ocean transport and, ultimately, *during rigging.*" Sprout–Bauer Br. at 13 (emphasis supplied).

**19.** Because Sprout–Bauer assumed a contractual duty to supervise the project, there is no need to determine whether Sprout–Bauer, by its actions, assumed the duty to supervise the rigging and installation of the plansifter. *See, e.g., Lombardo v. Hoag,* 237 N.J.Super. 87, 91, 566 A.2d 1185, 1187 (Law Div.1989) (a duty to act may arise where a party "has assu[m]ed a duty of reasonable care for the protection of the other person."). *Cf. Essex v. New Jersey Bell Telephone Co.,* 166 N.J.Super. 124, 128, 399 A.2d 300, 302 (App.Div.1979) ("[w]hile defendant's activity had its basis in a contract ... negligent performance of such an undertaking may give rise to a cause of action by third persons").

In addition, the contract indicates that Sprout–Bauer may have assumed a duty to warn Giammetta of the dangerous propensity of the center section component.

ed, Sprout–Bauer arranged for Golfetto officials to be present to supervise the installation of the plansifter. Unfortunately, Golfetto sent to the site two Italian-speaking individuals who could not communicate with the riggers. As Philbin testified, "[t]he people that were telling us how to install it couldn't speak English." O'Keefe App. at 60. Although Sprout–Bauer has argued that this testimony was not in the record before the district court, the court did have before it the deposition testimony of Salvatore Dattilo, one of Giammetta's riggers. He too stated that Golfetto employees were present during the rigging and installation of the plansifter, but "they couldn't speak English, so they had somebody interpreting for them, and that was kind of tough." Sprout–Bauer App. at 303. Dattilo further testified that no representative from either Sprout–Bauer or Golfetto gave the riggers instructions on how to rig or install the plansifter or the center section component. Sprout–Bauer App. at 302, 305. It is thus reasonable to infer from this evidence in the record that Sprout–Bauer failed to comply with its duty to supervise properly the rigging and installation of the plansifter and failed to "take all necessary precautions for the safety of" the riggers. Sprout–Bauer App. at 65.

For these reasons, the district court improperly entered summary judgment in Sprout–Bauer's favor, as genuine issues of material fact exist as to its primary liability for O'Keefe's injury.

## B. GOLFETTO'S LIABILITY:

O'Keefe also asserted that Golfetto supplied machinery which was crated in a defective manner and that Golfetto had not adequately warned Giammetta of the dangerous propensities of the center section component. As noted above, the district court did not rule on O'Keefe's design defect claim as it erroneously found that O'Keefe had not made this allegation.

Thus, the district court should review the merits of this claim on remand.

However, the court did analyze O'Keefe's assertion that Golfetto had failed to provide adequate warnings and it rejected this claim on the ground that *Campos v. Firestone Tire & Rubber Co.*, 98 N.J. 198, 485 A.2d 305 (1984), was "determinative." Sprout–Bauer App. at 447–48. Yet *Campos* wholly supports O'Keefe's contention that summary judgment was improper. In that case, a tire mechanic brought a strict products liability action against a tire manufacturer, alleging that it had inadequately warned foreseeable users of the product of the danger of inserting one's hand in the protective cage of the tire during its inflation. Although the tire manufacturer asserted that the danger was obvious, the court held that, in New Jersey, "the obviousness of a danger, as distinguished from a plaintiff's subjective knowledge of a danger, is merely one element to be factored into the analysis to determine whether a duty to warn exists. A manufacturer is not automatically relieved of his duty to warn merely because the danger is patent." *Id.* at 207, 485 A.2d at 309–10. The defendant further argued that it had no duty to warn because the plaintiff had subjective knowledge of the danger. Although the court agreed that a specific plaintiff's subjective knowledge would be relevant to the determination of whether the failure to warn proximately caused the plaintiff's injury, the court emphasized that, "'[t]he question whether the failure to warn proximately caused plaintiff's injury is a factual dispute that the jury should decide.'" *Id.* at 209, 485 A.2d at 311 (quoting *Michalko v. Cooke Color & Chemical Corp.*, 91 N.J. at 402, 451 A.2d at 187).

The district court gave three reasons for rejecting O'Keefe's failure to warn claim. First, it found that Giammetta had received the warnings, but as noted above, there is evidence in the record to the contrary.[20]

---

**20.** Further, even if Giammetta received the instructions, the question remains whether they were adequate. The record indicates that Golfetto did not place the warnings and instructions regarding the dangerous propensity of the center section component within the crates containing that component. Thus, it might be reasonable for a jury to determine that the instructions were inadequate in this respect. In addition, Tavares, O'Keefe's expert witness, stated in

Second, in the court's view, Golfetto was not specifically required to warn Giammetta of the imbalance of the center section component and the necessity to retain the wood pieces to maintain its balance, because O'Keefe was an experienced rigger and the danger was obvious. However, the record is not conclusive as to whether O'Keefe or the riggers, despite their extensive experience, were subjectively aware of this precise risk regarding the center section component. Although Philbin testified that "[t]he machinery was too heavy, we all knew it. It's dangerous to move, and they would tip over. So we had to be careful," Sprout–Bauer App. at 287, he also testified that he had never previously installed a plansifter. Thus, he could not have been familiar with the specific problems associated with the center section component. Indeed, the district court expressly recognized that "the evidence shows that Giammetta had never moved these particular machines before...." Sprout–Bauer App. at 445. It simply strains credulity to assume that the riggers would have removed the stabilizing wooden pieces from the crate if they had been aware of their necessity.

Third, the court held that, even if Golfetto had provided more detailed warnings, the riggers would not have followed them. As noted, it is speculative at this point whether Giammetta would or would not have heeded additional warnings if such warnings had been provided. Further, the question regarding whether the allegedly defective warnings did or did not proximately cause O'Keefe's injury because of his alleged subjective knowledge of the danger is for the jury; it should not be determined by the judge on a motion for summary judgment. *Campos*, 98 N.J. at 209, 485 A.2d at 311.

For these reasons, factual issues remain to be determined in order to analyze

O'Keefe's assertion that Golfetto failed to provide adequate instructions and warnings concerning the installation of the plansifter.

### III.

### THE MOTION TO DISMISS THE APPEAL

Sprout–Bauer has moved to dismiss this appeal under Fed.R.App.P. 10(a) on the ground that O'Keefe improperly augmented the record with evidence not considered by the district court.[21]

On June 10, 1991, Sprout–Bauer filed in the district court a motion for summary judgment. In support of that motion it attached excerpts of the depositions. On this appeal, O'Keefe relies in part on deposition testimony. However, Sprout–Bauer contends that much of the deposition testimony O'Keefe invokes was not brought to the district court's attention either in support of or in opposition to Sprout–Bauer's motion.

■ We have thoroughly reviewed the record before the district court, and it appears that counsel for O'Keefe may well have enlarged the appendix to include deposition testimony that was not presented to the district court. Certainly this practice is not to be condoned, and can constitute an adequate basis for dismissing an entire appeal. *Kushner v. Winterthur Swiss Insurance Co.*, 620 F.2d 404 (3d Cir.1980). Thus, in reaching our result we have confined our analysis to the record before the district court on the motions for summary judgment. At oral argument, O'Keefe's counsel sought to justify the possible expansion of the record by pointing out that, at the time of the summary judgment motions, the district court was familiar with materials previously submitted in the case. We are not impressed with this argument, as the court was entitled to rely on materi-

a report that the instructions were not in English and were incomplete. Sprout–Bauer App. at 509. He further stated that the "[a]bsence of proper instruction manuals on how to handle and assemble the machine, in proper English," proximately caused the accident which resulted in O'Keefe's injuries. Sprout–Bauer App. at 510.

This evidence is relevant to the question of the adequacy of the instructions and warnings.

21. Sprout–Bauer has also moved to strike O'Keefe's brief and appendix on appeal and for sanctions.

als specifically submitted on the motions for summary judgment rather than having to peruse the entire file. But in light of our conclusion that the district court erred in granting summary judgment based on the evidence available to it at the motions, we will deny Sprout–Bauer's motion to dismiss the appeal.[22]

## IV.

### CONCLUSION

In sum, the district court erred in granting summary judgment in favor of Sprout–Bauer, as O'Keefe has adequately demonstrated that there are genuine issues of material fact regarding whether Sprout–Bauer breached its duty: (1) to furnish Giammetta with non-defective equipment; (2) to warn Giammetta of the dangerous propensity of the center section component; and (3) to supervise the rigging and installation of the equipment. O'Keefe has also demonstrated that Sprout–Bauer's actions may have proximately caused his injuries.

In addition, the district court erred in granting summary judgment in favor of Golfetto. O'Keefe has demonstrated that genuine issues of material fact exist concerning whether Golfetto breached its duty to warn Giammetta, a foreseeable user of the product, of the dangerous propensity of the center section component, and whether that breach proximately caused his injuries. Further, the court mistakenly held that O'Keefe did not allege that the equipment was crated in a defective manner, and this assertion should be addressed on remand.

Accordingly, we will reverse the district court's order of summary judgment in favor of Sprout–Bauer and Golfetto, and remand the case for further proceedings consistent with this opinion. The parties will bear their own costs on this appeal.

---

22. Of course, we could strike O'Keefe's appendix, but there would be no point in doing so, as we have essentially decided this appeal without

---

it. Sprout–Bauer makes other contentions in support of its motion to dismiss the appeal but they are without merit and are denied.