**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0746-17T3

MARY C. GILVARY,

      Plaintiff-Appellant,

v.

GERALD M. CERZA,
CHRISTINA A. CERZA and
C.Z.,[1] parent of minor child C.Z.,

      Defendants-Respondents.

_____

      Submitted September 13, 2018 – Decided September 28, 2018

      Before Judges Hoffman and Suter.

      On appeal from Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-0188-15.

      Mary C. Gilvary, appellant pro se.

      Lamb Kretzer, LLC, attorneys for respondents (Robert D. Kretzer, on the brief).

PER CURIAM

---

[1] Now known as Christina A. Cerza.

Plaintiff Mary Gilvary appeals from a Law Division order granting summary judgment to defendants Gerald M. Cerza and Christina A. Cerza.[2] In 2015, plaintiff filed suit against defendants, seeking damages for a permanent and disabling back injury she allegedly sustained while caring for Christina's teenage daughter (C.Z.) in defendants' home. For the reasons that follow, we vacate and remand.

I.

Viewed in the light most favorable to plaintiff, Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995), these are the relevant facts. According to defendants, a congenital condition left C.Z. "severely disabled and in need of daily care." She requires a ventilator and gastrointestinal tube to survive; her condition renders her physically unable to care for herself or assist in any of her daily needs and necessities. Defendants acknowledge that C.Z. requires caretakers "to move, transfer position and reposition her to and from her bed, to and from her bathroom[,] and to and from her wheelchair." In addition, because of her total dependence on a ventilator, C.Z. requires daily skilled nursing care. According to plaintiff, defendants' health insurance company paid for the cost

---

[2] Intending no lack of respect, we refer to defendants by their first names for clarity and ease of reference.

A-0746-17T3

of the required skilled nursing care. At all times relevant, C.Z. weighed approximately eighty-nine pounds.

C.Z. resides with defendants in their home in Somerset County. Plaintiff's complaint describes defendants' residence as

> a large one[-]family home that has been extensively renovated to accommodate [C.Z.]. These renovations include[,] but are not limited to[,] an elevator that services this [three-]floor home so that [C.Z.] can be moved to all levels of this home by elevator while she is confined to her power [w]heelchair.

For approximately seven weeks, plaintiff worked in defendants' home as a pediatric home health nurse through Bayada Pediatric Home Healthcare, Inc. (Bayada). On December 18, 2012, plaintiff met with Christina who approved plaintiff to serve as a "fill in"[3] nurse for twelve-hour overnight shifts. According to plaintiff, this meant she would report for duty at defendants' home at 7 p.m., and care for C.Z. until relieved by another nurse, who would arrive at 7 a.m. the following morning. Plaintiff first provided care for C.Z. on December 21, 2012.

During her shifts, plaintiff acted as the patient's sole caretaker, as the defendants would be "resting, relaxing, or sleeping." According to plaintiff, her duties included transferring C.Z. to her bed, changing her into her sleeping

---

[3] Christina described the position to plaintiff as a "fill-in" so that C.Z.'s "other nurses and caretakers could receive time off."

A-0746-17T3

clothes, adjusting her sitting or sleeping position to insure her ventilator tube worked properly, and administering medication via her gastrointestinal tube and a nebulizer.

Even though defendants installed an elevator in their home to facilitate C.Z.'s safe movement, defendants did not possess a Hoyer Lift.[4] The record reflects no dispute regarding plaintiff's claim that a Hoyer Lift makes the lifting and transfer of a disabled patient safer for both the patient and the caregiver. After plaintiff began working for defendants, she questioned Christina regarding the absence of a Hoyer Lift in defendants' home. Christina responded, "We don't have one or need one"; however, Gerald disagreed, stating, "Yes, we need to get one." Christina replied, "No, I don't want one in the house."

As plaintiff continued to work shifts for defendants, she continued to complain to Christina "at the end of every shift" about the need for – and potential dangers of not having – a Hoyer Lift. After initially ignoring plaintiff's complaints, Christina eventually admitted a Hoyer Lift was "necessary and

---

[4] A Hoyer Lift, or sling lift, is a floor crane used to transfer a patient between two surfaces (e.g., a bed and a wheelchair) using a sling. See Santos v. Sunrise Med., Inc., 351 F.3d 587, 589 and n.1 (1st Cir. 2003). The device allows a caregiver to move a patient without the need for the caregiver to lift the patient physically.

4

required" for her daughter's care.  Christina then promised plaintiff she would obtain one "immediately[,] before her [c]hild was injured."

On the overnight shift of January 27, Christina informed plaintiff that she was in the process of obtaining a Hoyer Lift.  Plaintiff informed Christina that she could not continue to care for C.Z. without a Hoyer Lift and that defendants should "look for a replacement [n]urse" if they did not intend to obtain one.

On February 3, plaintiff arrived for her shift but again noticed defendants had failed to secure a Hoyer Lift.  According to plaintiff, she did not leave – despite the continued absence of a Hoyer Lift – because once she "started her shift, she was obligated by law to stay with her patient."  The following morning, plaintiff confronted defendants, who assured her they had ordered a Hoyer Lift but claimed its delivery was delayed.   Defendants again acknowledged the need for a lift and the potential dangers of not having one.

According to plaintiff, when she arrived for her overnight shift on February 10, she learned that Christina had already gone out for the evening. By the time plaintiff determined the Hoyer Lift still had not been obtained, she had already begun her shift, leaving her no choice, in her view, but to remain and care for her patient, C.Z.  The next morning (during the same shift), at approximately 6:30 a.m., plaintiff alleges she attempted to "lift and position"

C.Z. In doing so, plaintiff contends she "severely injured her lower back." During January and February, plaintiff worked a total of eleven shifts for defendants. The February 10 shift was her last.

Defendants do not challenge plaintiff's assertions that they admitted they needed a Hoyer Lift and assured plaintiff they would obtain one. Instead, Christina's answers to interrogatories appears to challenge, at least in part, plaintiff's account of what occurred during her final shift caring for C.Z.:

> On February 10, 2013[,] at approximately 8 [p.m.], I personally transferred my daughter [C.Z.] from her wheelchair to her bed. At no time whatsoever did the plaintiff ever transfer my daughter from her wheelchair to her bed or from her bed to her wheelchair. I always did the transfer when the plaintiff was working. After prayers on February 10, 2013, I went to bed. The following morning I went to [C.Z.'s] room and the plaintiff claim[ed] she hurt her back when she repositioned [C.Z.] at some point in the night.

Plaintiff initially received physical therapy for her back injury, without success. She describes the injury to her lower back as "inoperable, permanent, and career ending." She now receives Social Security benefits.

On February 10, 2015, plaintiff filed her complaint, asserting a negligence claim against defendants for their failure to provide the promised Hoyer Lift. Following discovery, defendants moved for summary judgment. On August 4, 2017, the court granted summary judgment to defendants and dismissed

6

plaintiff's complaint. Because Bayada sent plaintiff to defendants' home specifically to care for C.Z., the motion judge accepted defendants' argument that plaintiff could not sue for injuries caused by the exact work she came to perform. Additionally, the judge concluded that plaintiff needed an expert witness to explain the risks and benefits of the Hoyer Lift, viewing the subject as beyond the ken of the average juror. This appeal followed.

II.

We review a trial court's grant of summary judgment de novo. Cypress Point Condo. Ass'n v. Adria Towers, LLC, 226 N.J. 403, 414 (2016). "[The] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm., 140 N.J. 366, 378 (1995). Summary judgment may be granted when the evidence before the trial court on the motion, viewed in a light most favorable to the non-moving party, indicates there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. R. 4:46-2(c); see also Brill, 142 N.J. at 540. In reviewing an order granting or denying summary judgment, we employ the same standard as the trial court. Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012).

The trial court's "function is not . . . to weigh the evidence and determine the truth . . . but to determine whether there is a genuine issue for trial." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). To make the determination, the trial judge must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Ibid. The judge must assume the non-moving party's version of the facts as true and give that party the benefit of all favorable inferences available in the record. Id. at 536.

## A.

We first address the judge's determination that plaintiff could not sue for injuries caused by the exact work she came to perform. "[N]egligence is conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm." Restatement (Second) of Torts § 282 (Am. Law Inst. 1965). When a person fails to take reasonable precautions to prevent causing harm to another, that person acts negligently. Id. § 284.

> To determine whether a defendant's conduct is negligent, we consider what a "prudent [person]" would have done in the defendant's circumstances. Weinberg v. Dinger, 106 N.J. 469, 484 (1987). In addition to

A-0746-17T3

showing that a defendant failed to act with reasonable care, a plaintiff must show that a defendant owed the injured party a duty of care. Kelly v. Gwinnell, 96 N.J. 538, 548 (1984). Traditionally, courts have determined the circumstances under which a defendant owes a legal duty to another. Carvalho v. Toll Bros. & Developers, 143 N.J. 565, 572 (1996). Similarly, the scope of the duty owed is a matter of law. Kelly, supra, 96 N.J. at 552.

[Pfenninger v. Hunterdon Cent., 167 N.J. 230, 240 (2001).]

The formulation of a duty of care and its imposition derive from considerations of public policy and fairness to the litigants. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993).

Whether a person owes a duty of reasonable care toward another turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy. [Goldberg v. Hous. Auth. of Newark, 38 N.J. 578, 583 (1962).] That inquiry involves identifying, weighing, and balancing several factors — the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution. Ibid. The analysis is both very fact-specific and principled; it must lead to solutions that properly and fairly resolve the specific case and generate intelligible and sensible rules to govern future conduct.

[Hopkins, 132 N.J. at 439.]

In determining whether a duty of care was owed to an injured person, a judge must consider "the relationship of the parties, the nature of the risk – that is, its foreseeability and severity – and the impact the imposition of a duty would have on public policy."  Dunphy v. Gregor, 136 N.J. 99, 108 (1994) (citing Goldberg, 38 N.J. at 583).

According to plaintiff, a registered nurse, C.Z.'s weight of eighty-nine pounds, "was far above the [fifty-pound] limit for a single nurse to lift and transfer," thus requiring a Hoyer Lift.  Nothing in the summary judgment record challenges plaintiff's assertion regarding the fifty-pound limit.   In fact, it appears that the National Institute for Occupational Safety and Health (NIOSH) recommends a lower thirty-five pound maximum weight limit for use in patient-handling tasks.[5]  See generally Alloway v. Bradlees, Inc., 157 N.J. 221, 236

---

[5] In 1994, NIOSH published the "Revised NIOSH Lifting Equation—an ergonomics assessment tool that can be used to calculate the recommended weight limit for two-handed manual-lifting tasks."  Thomas R. Waters, When Is It Safe to Manually Lift a Patient?, 107(8) A.J.N. 53, 53 (2007).  http://www.asphp.org/wp-content/uploads/2011/05/When_Is_It_Safe_To_Manually_Lift_A_Patient.pdf.
This equation "can be used to calculate a recommended weight limit for a limited range of patient-handling tasks in which the patient is cooperative and unlikely to move suddenly during the task."  Ibid.  While the publication benchmarked twenty-three kilograms (about 51 pounds) as the "maximum weight to be lifted under ideal conditions[,]" id. at 54 (citation omitted), "[i]n general, the revised equation yields a recommended [thirty-five pound] maximum weight limit for use in patient-handling tasks," and "[w]hen weight to be lifted exceeds this limit, assistive devices should be used."  Id. at 53.

(1999) (finding applicable in workplace injury case "the well-established principle that the violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established").

Pursuant to N.J.R.E. 201(a):

> Law which may be judicially noticed includes the decisional, constitutional and public statutory law, rules of court, and private legislative acts and resolutions of the United States, this state, and every other state, territory and jurisdiction of the United States as well as ordinances, regulations and determinations of all governmental subdivisions and agencies thereof.

On appeal, in our discretion, we "may take judicial notice of any matter specified in [N.J.R.E.] 201, whether or not judicially noticed by the [trial] judge." N.J.R.E. 202(b); Marchak v. Claridge Commons, Inc., 261 N.J. Super. 126, 131-32 (App. Div. 1992) ("Of course, we may take judicial notice of statutes, regulations and case law, whether or not presented to the motion judge . . . in deciding legal issues."), aff'd, 134 N.J. 275 (1993).

Exercising our discretionary authority, we take judicial notice of the NIOSH guidelines. Since C.Z. weighed significantly greater than applicable NIOSH recommended weight limit for lifting without assistive devices, the risk of plaintiff sustaining an injury while caring for C.Z. without some assistance

11

with patient transfer was both foreseeable and likely to have severe consequences. The foreseeability of this risk "is the indispensable cornerstone of any formulation of a duty of care. . . ." Dunphy, 136 N.J. at 108. Further, we discern no adverse impact on any public policy by the imposition of a duty here. Both of these factors support imposing a duty of care on defendants. Ibid. Thus, the relationship of the parties requires careful consideration.

"As a general rule, a landowner has a non-delegable duty to use reasonable care to protect invitees against known or reasonably discoverable dangers." Rigatti v. Reddy, 318 N.J. Super. 537, 541 (App. Div. 1999) (quoting Kane v. Hartz Mountain Indus., 278 N.J. Super. 129, 140 (App. Div. 1994), aff'd o.b., 143 N.J. 141 (1996)). "This general rule operates to protect individuals performing work on the premises of the landowner, most commonly independent contractors and their employees." Ibid. (citations omitted). A landowner cannot escape this duty even if the independent contractor was also negligent. Sanna v. Nat'l Sponge Co., 209 N.J. Super. 60, 66–67 (App. Div. 1986).

> The landowner's duty includes the obligation of making a reasonable inspection to discover defective and hazardous conditions. [Zentz v. Toop, 92 N.J. Super. 105, 111 (App. Div.), aff'd, 50 N.J. 250 (1966).] The obligation upon the landowner of either making the condition of his premises reasonably safe or giving adequate warning imposes upon him the duty to furnish

such safeguards as may reasonably be necessary. See [id.] at 113.

[Sanna, 209 N.J. Super. at 66.]

A well-settled exception to this rule was applied by the trial judge in dismissing plaintiff's case – that is, "[T]he duty to provide a reasonably safe working place for employees of an independent contractor does not relate to known hazards which are part of or incidental to the very work the contractor was hired to perform." Muhammad v. N.J. Transit, 176 N.J. 185, 199 (2003) (quoting Wolczak v. Nat'l Elec. Prod. Corp., 66 N.J. Super. 64, 75 (App. Div. 1961)).

> A landowner "[]is under no duty to protect an employee of an independent contractor from the very hazard created by the doing of the contract work.[]" [Muhammad, 176 N.J.] at 198 (quoting Gibilterra v. Rosemawr Homes, 19 N.J. 166, 170 (1955)). This exception to the landowner's general duty exists because "[t]he landowner may assume that the worker, or his superiors, are possessed of sufficient skill to recognize the degree of danger involved and to adjust their methods of work accordingly." Id. at 199 (quoting Wolczak, supra, 66 N.J. Super. at 75).
>
> [Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 407 (2006).]

However, this exception applies only when "the landowner does not retain control over the means and methods of the execution of the project." Ibid.

(quoting Muhammad, 176 N.J. at 198); see also Jarrell v. Kaul, 223 N.J. 294, 316–17 (2015) (citing Majestic Realty Assocs. v. Toti Contracting Co., 30 N.J. 425, 430–31 (1959)) ("[A] person who engages an independent contractor . . . . will be held liable if he or she . . . retains control of the manner and means by which the work will be performed . . . .").

The record before us contains clear evidence that defendants retained control over the means and methods of plaintiff's performance of her duties that required the movement and transfer of C.Z. We therefore conclude defendants retained a sufficient level of control over plaintiff's work – at least in regard to patient handling and transfer – that defendants had a duty to provide plaintiff a reasonably safe place to work. A jury is required to determine whether defendants breached their duty, and if so, whether their breach was a proximate cause of plaintiff's back injury. Sanna, 209 N.J. Super. at 66.

### B.

We next address the judge's determination that plaintiff could not sustain her burden of proof to establish that defendants violated a duty to her without expert testimony. In determining whether a plaintiff must provide expert testimony, a court must consider "whether the matter to be dealt with is so esoteric that jurors of common judgment and experience cannot form a valid

judgment as to whether the conduct of the [defendant] was reasonable." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 407 (2014) (quoting Butler v. Acme Mkts., Inc., 89 N.J. 270, 283 (1982)). In those instances, the jury would have to "speculate without the aid of expert testimony." Torrey v. Schripps, Inc., 342 N.J. Super. 419, 430 (App. Div. 2001) (citing Kelly v. Berlin, 300 N.J. Super. 256, 268 (App. Div. 1997)).

Basic principles of negligence law routinely allow lay jurors to determine if a defendant acted unreasonably. Model Jury Charge (Civil), 5.10A, "Negligence and Ordinary Care" (approved before 1984). Basic notions of reasonable behavior do not necessarily require an expert to testify regarding standards of care, particularly where the case does not involve suit against a licensed professional covered by the Affidavit of Merit statute. Jacobs v. Jersey Cent. Power & Light Co., 452 N.J. Super. 494, 505 (App. Div. 2017).

To admit an expert's testimony, it must have some logical connection to the disputed issue in the case. See N.J.R.E. 403; Muise v. GPU, Inc., 371 N.J. Super. 13, 59–60 (App. Div. 2004). "Because the linchpin for the admission of expert testimony is the perceived need to assist the jury, such expert testimony is generally not admissible as to matters to be submitted not to the trier of fact but to the court." Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence,

15

cmt. 1 on N.J.R.E. 702. Thus, "a matter of law to be determined by the court is not the proper subject of expert testimony." Ibid.

The ultimate issue in the case is whether defendants breached a duty owed to plaintiff. "[T]he question of whether a duty exists is a matter of law properly decided by the court, not the jury…." Strachan v. John F. Kennedy Mem'l Hosp., 109 N.J. 523, 529 (1988). As discussed in Section A, the question for the jury to answer will be whether defendants failed to provide plaintiff a reasonably safe work place, and if so, whether that failure was a proximate cause of plaintiff's lower back injury.

While we conclude plaintiff was not required to submit expert testimony regarding the issue of whether defendants owed plaintiff a duty of care, we acknowledge that "open issues of causation and damage are plainly amenable to expert testimony." Estate of Spencer v. Gavin, 400 N.J. Super. 220, 255 (App. Div. 2008). We therefore agree with the trial court with regard to the need for plaintiff to present competent expert testimony to establish causation and damages, i.e., a medical expert who will explain whether a Hoyer Lift was appropriate to transfer this patient, the use of a Hoyer Lift, the means by which it facilitates safe patient lifting and transfer, and how and why it would have likely prevented plaintiff's back injury.

16

We note that the motion judge's opinion acknowledges that plaintiff requested an opportunity to obtain an expert witness regarding the Hoyer Lift; however, the judge denied her request because trial was scheduled for the following month.

We conclude the judge mistakenly exercised his discretion when he denied plaintiff the opportunity to obtain an expert witness regarding the Hoyer Lift. We arrive at this conclusion "bear[ing] in mind the judge's understanding at that time of the applicable substantive law, and his mistaken perception that [defendants] did not have a legal duty" to provide plaintiff a reasonably safe place to work. Ibid. In light of our clarification in Section A of the legal principles involved, as to the existence and scope of defendants' duty, we believe the interests of justice require us to afford both plaintiff and defendants a renewed opportunity on remand to marshal expert testimony on the use of a Hoyer Lift in these circumstances and whether it would have likely prevented plaintiff's injury, or at least reduced the severity of any potential injury. Such expert testimony will enable the jury to competently address the issues of liability, causation, and damages.

Within forty-five days of this decision, the Law Division shall conduct a case management conference. Since it does not appear any parties were deposed

in the case, and such depositions would likely prove beneficial to the parties in securing expert testimony, the trial court shall permit the parties a limited time to complete depositions of the parties, followed by a schedule for the production of expert reports and then completion of expert witness depositions.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0746-17T3